THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARCHIE PRICE, Defendant-Appellant.

First District (3rd Division) Nos. 77-340, 78-1701 cons.

Opinion filed December 31, 1979.

1114

James J. Doherty, Public Defender, of Chicago (Robert T. Guch and Aaron L. Meyers, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

The unarmed victim is dead, killed by the knife wielded by the defendant. The jurors were asked to determine if it was murder, voluntary manslaughter or self-defense. They decided murder. Price was sentenced to a prison term of 14 years to 14 years and one day. We affirm.

On the afternoon of January 9, 1971, Melvin Clark and a man named Rudy met defendant Archie Price in his Chicago apartment. The three went to the nearby apartment of Adline Lloyd, the defendant having purchased some liquor on the way. They entered Lloyd's apartment through the back door and met Lloyd, her daughter Alma, Johnny Jones and James Petty. The seven sat on the enclosed sunporch of the apartment, watching television and drinking. Price shared some of the liquor he had purchased with the others.

When Price arrived, James Petty was sitting on a chair near the entrance to the kitchen. Price first sat down in the kitchen, then moved to a stool near Melvin Clark, and ended up on a couch next to Petty's chair. Price offered Petty some wine, and Petty poured it into a jar he was using as a glass. Price complained about the amount of wine that Petty had taken by asking Petty if he was trying to take the whole bottle. Petty responded by asking if Price wanted the wine back. Price said no.

The defendant then left the sunporch. Lloyd, who testified at trial that she had "a little difficulty" seeing, saw Price return to the sunporch through the kitchen. She had not seen Petty move from his chair. Neither Lloyd nor Clark saw what happened next, but when Clark looked up he suddenly noticed that Petty and Price were scuffling. Their struggle carried them over the top of Petty's chair, and Clark and Lloyd both heard Petty ask Price, "What's wrong with you, man?" The two men landed at Clark's feet, and Petty let out a sigh. Petty lay on top of Price, holding the defendant's right hand. After a moment the struggle stilled. Price extricated himself and rose to his feet holding a butcher knife in his right hand. He said, "Call the police," and walked out of the apartment.

When police arrived several minutes later, they found Petty lying face down on the porch, breathing shallowly and bleeding from wounds in his left side, left arm and right hand. He was taken to the hospital, but died on the way. An autopsy later disclosed that Petty died of a stab wound in his left side which punctured a lung and drained the body of blood. The autopsy also revealed that at the time of his death Petty had a blood alcohol content of .274 milligrams percent. The pathologist who conducted the autopsy testified that a reading of .100 milligrams percent was considered to indicate intoxication.

After Petty died, police returned to Lloyd's apartment, where they

were given Price's name, description and address. They went to the address and had the manager open the door to Price's apartment after no one answered their knock. The entry was made without a search warrant. Although Price was not in his room, police searched the area and removed Price's social security cards, his phone bill, a letter from Buffalo addressed to him and a photograph.

In the course of their investigation over the next few days the police called numbers on the phone bill, spoke with Adline Lloyd's other daughter who also knew Price and put a stop order on his paycheck from the University of Illinois Medical Center. On January 11, 1971, an arrest warrant for Price was issued. That same day the manager of Price's building told police that Price had returned to his room early on January 11, taken his television set, and left. The Chicago police were unable to locate Price, and the F.B.I. was asked to obtain a Federal warrant for his arrest.

On June 26, 1974, F.B.I. agents in Peoria went to an apartment in that city and were admitted by its occupant. Inside, the agents saw Price. When an agent told him that the bureau had a warrant for his arrest on charges in Chicago, Price responded, "Yes, I know." He was then taken into custody.

Brought to the Peoria county jail, Price declined to make a statement to the agents. Two days later, Price was driven to Chicago by two Chicago police officers. One of the officers testified that Price told them that he had offered wine to Petty, that Petty had taken more than he should have and that he had pointed this out to Petty. When he had returned from the bathroom Petty kicked him in the leg, and he then took a butcher knife and stabbed Petty. Price also told the officers that after the incident he went outside and threw away the knife.

At trial, the State introduced this statement. Price took the stand to offer his account of the stabbing. Price testified that he, Clark and Rudy met Petty and the others at Adline Lloyd's. Price, who knew Petty and had never been mistreated by him, thought that Petty was intoxicated. When Price asked Petty if he was trying to pour out all the wine, Petty replied by asking if Price wanted the wine back. Price said no. When Price tried to return to his seat from the bathroom, he had to pass in front of Petty who was sitting in a chair. Petty kicked Price in the leg. Price testified that when he went for his coat pocket, Petty jumped up and tackled him. Price hit the floor, got the knife out of his pocket and "tussled" with Petty over the knife. Price got up and told the others to call the police when Petty weakened. According to the defendant, events took place so fast that he was on the floor before he realized what was happening.

When confronted with his statements at the preliminary hearing, Price agreed that he had testified that Petty was trying to take the knife

away from him and that they scuffled on the floor over the knife. He denied testifying that he had taken the knife out and told Petty, "I'm going to use it," before he and Petty fell to the floor. Price told the jury that his back had been on the floor, that he had not wanted to hurt anyone and that he was trying to get the knife out of his pocket to defend himself.

Archie Price was 55 years old at the time of the incident. Petty was 26. Price was 5 foot, 5 inches tall and weighed 168 pounds. Petty was 6 foot 1 and weighed 175.

Price also testified that when he emerged from under the wounded Petty, he was torn between staying at the scene and leaving. He told the jury that he followed that part of his mind which urged him to leave. Price said that he threw away the knife and went to the home of a friend in Chicago, where he stayed for the next 3 weeks. According to Price, when he returned to his room the day after the stabbing, the manager told him to get out because Petty had died and the police were looking for Price. After visiting Melvin Clark and telling Clark that he did not know what had happened to make Petty jump on him, Price followed the manager's advice, took his radio and television set from his room and returned to his friend's house. Price tried to pick up his paycheck, but when told that police would have to be called, he told his employer that he would get the check later. Attempts by Price's sister to retrieve the check for him were unsuccessful.

After a month in Chicago, Price moved to Peoria where he lived with his sister-in-law and found employment under the name of Lloyd Hollins. Price testified that he talked with police during the trip back to Chicago and, in order to cut the conversation short, told them, "He kicked me and I stabbed him."

In opening and closing arguments, Price's trial counsel said that Price was a "wino," and that the stabbing occurred at a "wino party." Counsel also asked the jury to consider why the State had not called Fela Petty, mother of the deceased, as a witness at trial, then told the jury that Fela Petty was herself deceased.

The defendant contends that the State failed to prove him guilty beyond a reasonable doubt, because the evidence showed that he acted either in self-defense or with an unreasonable belief that deadly force was necessary to prevent imminent great bodily harm. Defendant asks that his conviction for murder be reversed or reduced to voluntary manslaughter.

■■ Defendant does not dispute that he stabbed James Petty, or that his intent could be proven from the natural and probable consequences of his action. Whether the defendant acted in self-defense as defined by section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 7—1) was a question of fact to be determined by the jury, with the burden of proof upon the State. (*People v. Neal* (1975), 26 Ill. App. 3d 22, 24, 324

N.E.2d 476, 478.) The jurors could refuse to accept defendant's testimony if they found that he was not credible. Such a decision could have been based on his prior inconsistent statements at the preliminary hearing, his statement to the police on the way back to Chicago and his demeanor when testifying. If the jury did not believe the defendant, then his testimony, standing alone, would not raise a reasonable doubt of guilt. (*People v. Lynch* (1976), 43 Ill. App. 3d 1039, 1042-43, 358 N.E.2d 17, 19; *People v. Pitchford* (1976), 39 Ill. App. 3d 182, 187, 189, 350 N.E.2d 170, 175, 176.) Here the defendant provided the only first-hand account of what led to the scuffle and stabbing. His testimony supported his theory of reasonable or unreasonable belief in the need for self-defense, but his defense hinged on his credibility. And, the evidence of flight was competent circumstantial evidence that tended to refute his theory.

■■ ■ If the defendant drew his knife and threatened Petty, who had taken too much wine, *before* Petty attacked Price, or if Price drew the knife *in response* to Petty's attack without entertaining the notion of self-defense, this was murder. If the defendant drew the knife *in response* to Petty, believing unreasonably that the use of deadly force was necessary to protect himself from imminent great bodily harm, this was voluntary manslaughter. If the defendant drew his knife and stabbed Petty only *after* Petty attacked him and put him in reasonable fear of great bodily harm, the stabbing was justifiable since it came in self-defense. The jury was presented with each of these outcomes, but by its verdict it chose murder. The jury's decision on the facts was supported by the evidence adduced at trial, and the judgment of conviction should be affirmed.

■■ The defendant also contends that he did not receive the effective assistance of counsel at his trial. Because in many cases the decision to make a motion, raise an objection or put on a certain witness is a matter of strategy, caught up in the tactical notions of the best way of winning a verdict of acquittal, a defendant bears a heavy burden of showing that his counsel conducted the trial in a way so unfair to the defendant that he was denied the effective assistance of counsel. The supreme court has phrased the burden by saying that the incompetency of counsel must reduce the trial to a farce or sham before a new trial will be granted. *People v. Murphy* (1978), 72 Ill. 2d 421, 436, 381 N.E.2d 677, 685; *People v. Torres* (1973), 54 Ill. 2d 384, 391, 297 N.E.2d 142, 146.

Price complains of several instances in which his counsel at trial failed to make a motion, declined to raise an objection or made an ill-advised argument to the jury as illustrations of the farce to which his trial was reduced. We do not agree that counsel's conduct demonstrated incompetency or ineffective assistance, and we decline to reverse on that ground.

■■ The defendant complains that no motions to suppress the items

seized from his apartment or his statement to police were made. The warrantless entry of the defendant's apartment was authorized by the exigent circumstances exception to the warrant requirement. (*Dorman v. United States* (D. C. Cir. 1970), 435 F.2d 385; *People v. Denwiddie* (1977), 50 Ill. App. 3d 184, 365 N.E.2d 978.) The seizure of the items as objects within the plain view of police was at least arguably proper, since although the social security cards, letter, bills and photographs were not evidence of a crime, they would aid in the apprehension of a fugitive suspect. (See *State v. Collett* (Mo. 1976), 542 S.W.2d 783; 2 W. LaFave, Search and Seizure §6.7, at 487 (1978).) In addition, there was little harm in counsel's failure to move to suppress the items. Although the tale of the seizure was related to the jury by police, the items themselves were ruled inadmissible at trial pursuant to defense counsel's objection as irrelevant to the issue of defendant's guilt. Even if the items had been taken unlawfully, Price's arrest would not be quashed, since it was not the fruit of the search and seizure. Likewise, the defendant's statement to the F.B.I. agents when they first confronted him in Peoria and informed him they had a warrant for his arrest was made before he received his *Miranda* warnings, but was nevertheless admissible as a clearly volunteered statement. (*People v. Hubbard* (1973), 55 Ill. 2d 142, 151-52, 302 N.E.2d 609, 614.) Objection to this volunteered remark would have been futile. It is a matter of judgment whether to present a motion to suppress. We believe such a motion here would not have assisted the defendant. But, even if counsel's judgment was in error that did not reduce his assistance to the level of ineffectiveness. *People v. Ussery* (1974), 24 Ill. App. 3d 864, 868, 321 N.E.2d 718, 721.

■■■■ Defendant also claims that ineffectiveness was demonstrated by the failure to object to three instances of hearsay testimony—Clark and Lloyd's versions of Petty's statement to Price during the scuffle, a police officer's rendition of Price's statements to his apartment manager and testimony of police officers that persons at Lloyd's gave them the description and address of Archie Price. We might note that Price's counsel offered frequent objections during the trial to the State's repeated attempts to place inadmissible hearsay testimony before the jury. These objections were sustained. Failure to object to the statements that defendant now cites was not an example of ineffective assistance. Petty's outcry was admissible as a spontaneous utterance. The manager's statement was used to detail the course of the police investigation, not to prove the truth of the matter asserted, and so was not hearsay. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) The descriptions and address were hearsay, but under the circumstances were harmless and were not the reason Price was convicted. We find no incompetence in the attempts to keep these instances of hearsay out of the defendant's trial.

 Finally, it must be noted that in questions of strategy, trial counsel is not proven incompetent merely because appellate counsel or even the members of the appellate court think in retrospect that they would have conducted the case differently. (*People v. Colon* (1974), 20 Ill. App. 3d 858, 867, 314 N.E.2d 664, 671.) Failure to object to a police officer's characterization of Petty's wounds as defensive falls within this rule. We cannot speculate on whether the officer, who viewed Petty's body at the morgue, would have been proven to be an expert on the nature of knife wounds, and the otherwise competent assistance given by trial counsel was not tainted by the decision to let this piece of evidence go to the jury unchallenged. In the same vein, while we perhaps would not choose to call a client facing a long prison term a "wino" to the jury, this might have served to explain the defendant's appearance, which does not appear on the record before this court, or might have been said to impeach by association the State's witnesses, who were engaged in a drinking party with Price. Likewise, while normally failure to present a deceased witness is not a matter of wonder, trial counsel might have sought to emphasize that while the defendant was present before the jury, no one could tell the jury about James Petty and so explain the likelihood of an unprovoked attack. Trial counsel's argument did not descend to the level of incompetence. The jury was adequately apprised of the defendant's theory of the case. The evidence favoring the defendant was reviewed, and the evidence which harmed Price was attacked in closing argument. The defendant's right to effective assistance of counsel at trial was not violated.

Archie Price was found guilty by a jury of the offense of murder. That conviction came at a trial at which the defendant enjoyed the effective assistance of counsel. The verdict was supported by the evidence.

Judgment affirmed.

McNAMARA and McGILLICUDDY, JJ., concur.