THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PRENTISS JACKSON, Defendant-Appellant.

First District (1st Division) No. 1—86—2343

Opinion filed February 26, 1990.

106

Randolph N. Stone, Public Defender, of Chicago (Timothy J. Leeming and James H. Reedy, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Gayle L. Terry, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, Prentiss Jackson (defendant) was convicted of two counts of attempted murder (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 9—1), two counts of armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2) and three counts of aggravated battery (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(a)). The lesser included offenses of armed violence and aggravated battery merged into the attempted murder convictions, and defendant was sentenced to 30-year concurrent terms of imprisonment.

Defendant appeals his convictions, contending that (1) he was denied a fair trial where the trial court admitted into evidence a weapon recovered at the time of his arrest; (2) he was denied a fair trial based upon the State's presentation of nonverbal testimony at trial; (3) he was denied a fair trial as a result of improper prosecutorial comments during trial; (4) he was denied a fair trial because of judicial misconduct at trial; (5) he was denied a fair trial as a result of ineffective assistance of counsel; (6) he was denied a fair trial because of the admission of improper hearsay testimony; and (7) he was not proved guilty beyond a reasonable doubt. We affirm.

The record discloses that on August 17, 1985, at approximately 6 a.m., Gladys Powell sustained a near-fatal injury as a result of a gunshot wound to the left side of her head. Her husband, Leroy Powell, also present at the shooting, did not suffer any injury. After Leroy provided police with a description of the offender, whom he only knew as "Rabbit," defendant was arrested and a .9 millimeter, semi-automatic gun with a black rubber handle was recovered.

Prior to trial, defendant presented a motion *in limine* requesting the trial court, *inter alia*, to prohibit the State's introduction of the .9

millimeter gun because Leroy's description of the weapon used for the commission of the offense specifically excluded the gun. The trial court denied the motion, finding that the gun would be admissible upon the State's showing that it was suitable for the commission of the crime. Despite Leroy's testimony during trial that the .9 millimeter gun was not the weapon used in the crime, the trial court admitted the gun into evidence.

Leroy, the State's sole eyewitness, testified to the following at trial: In July 1985, Leroy and his wife were both heroin addicts. At that time, he was approached by Nicky Vaugh, a "street dealer," concerning the possibility of him selling narcotics. Vaugh introduced Leroy to a man named "T-Fly," who was interested in utilizing Leroy's apartment for drug distribution. Leroy agreed to the arrangement, and, for protection, burglar gates and bars were affixed to the front and rear doors of his apartment.

After his apartment was prepared for drug sales, T-Fly introduced him to a man named "Squeaky," who was to be in charge of the overall drug operation emanating from Leroy's apartment. Leroy's function in the operation was that of a "door man." As such, he was responsible for answering the door, taking the drug order and relaying the order to Squeaky, who would fill the order. After Squeaky filled the order, Leroy would tender the drugs to the customer in exchange for money. The transactions always took place through the locked burglar gates. Leroy estimated that the drug business grossed approximately $500 per day and he received $100 per day for his services as "door man."

In addition to Squeaky being responsible for replenishing the apartment with drugs, Squeaky was also responsible for collecting the cash proceeds from the drug sales. It was through these deliveries and collections that Leroy first met defendant, who was initially an "armed escort" for the drug operation. Defendant carried either a .357 magnum or a .45 or .38 automatic and "would check to make sure no one was out to stick the guy up that was delivering" "the drugs and picking the money up."

Defendant eventually became Squeaky's "relief man" and ultimately was in charge of the drug distribution operation, performing all of Squeaky's duties. Defendant resided at Leroy's apartment on an average of six days each week and was rarely seen without a gun in his possession.

On August 16, 1985, at approximately 12:30 p.m., defendant entered Leroy's apartment with his girl friend, Robin Crump. Defendant and Robin spent the rest of the day and night in a bedroom of the

apartment freebasing cocaine. Defendant had two guns on that day, "one was blue with a large wooden grip *** and [the other was] an automatic, like *** a military 45."

Gladys arrived at the apartment at approximately 2 p.m., and she and Leroy used heroin until 8 p.m., at which time Gladys left. At 4 a.m., Gladys returned to the apartment with hamburgers, coffee, cigarettes and a newspaper. Defendant remained in the bedroom with Robin until 5 a.m., at which time he left the apartment to take Robin home.

Shortly thereafter, defendant returned to the apartment and stated that he had forgotten something and retreated into the bedroom where he and Robin had been earlier that day. Gladys was sitting on the couch and Leroy was sitting on a chair at a table reading the newspaper. Defendant appeared agitated and nervous when he emerged from the bedroom, but nevertheless conversed with Gladys and Leroy. While reading the paper and conversing with defendant, Leroy next "saw a movement out of the corner of [his] eye." He looked up and saw defendant point and fire a pistol at Gladys. Defendant then pointed and fired the pistol at Leroy. Leroy attempted to rise from his chair, but fell backwards and landed on the floor. Leroy "froze" and "played dead" on the floor until defendant exited the apartment. Upon defendant's exit, Leroy comforted Gladys, who was slumped over, moaning and bleeding from the side of her head. Because he did not have a telephone, Leroy ran to Ricky Wade's apartment, which was located on the second floor below his apartment, and telephoned the police.

On cross-examination, Leroy described the gun used in the shooting as a "[b]luesteel, large wooden handle[d], revolver." He further testified that when defendant returned to the apartment after taking Robin home, defendant was holding a gun, which was wrapped in a towel. Leroy also stated that the .9 millimeter gun recovered by the police at the time of defendant's arrest was not the gun used to shoot Gladys.

Laurie Hamrick, a 16-year-old prostitute who lived with Ricky and other individuals in the apartment below Leroy and Gladys' apartment, testified for the State as follows: She first met defendant in Ricky's apartment during a "dope deal," but defendant frequently came to Ricky's apartment to smoke cocaine, talk, and to use the telephone. Laurie was aware of the drug-distribution operation in Leroy and Gladys' apartment and that defendant possessed guns, which he kept under his shirt in his pants.

On August 17, 1985, between 2 a.m. and 4 a.m., Gladys came to

Laurie's apartment carrying cigarettes, coffee and a newspaper. She stayed a short while before returning to her third-floor apartment.

At approximately 5 a.m., as Laurie was sitting in the kitchen of her apartment near an opened back door, Ricky and defendant approached and stopped immediately outside the screen door. Laurie overheard defendant tell Ricky "[t]hat he was going to go up to Leroy and Gladys and kill them because—*** he had done their drugs." Defendant proceeded up the back stairway to Leroy and Gladys' third-floor apartment. Laurie subsequently "heard a shot, *** and then a couple of seconds later, [she] heard two shots, and then [she] heard like a body fall, *** and *** [she] heard [defendant] running down the back stairs." Laurie peeked out of the window and observed defendant, who was wearing a gray, cut-off sleeve shirt, blue pants and a black hat, running from the back stairway towards the train tracks approximately one-half block away.

Detective Fred Stone of the Chicago police department testified that when he arrived at Leroy's apartment on August 17, 1985, Leroy described the perpetrator as a black male wearing a black baseball cap, a black- or gray-type jogging shirt or sweater, a pair of blue jogging pants and a pair of white Nike gym shoes. Upon defendant's arrest approximately 48 hours later, defendant was wearing a pair of blue denim jeans with the cuffs "rolled real wide," a gray and dark-trimmed sweater and a pair of white Nike gym shoes. Also recovered at the time of defendant's arrest was a black baseball cap and a .9 millimeter handgun.

Defendant's nephew, Gregory Smith, and wife, Patrice Jackson, testified as alibi witnesses. They stated that defendant came home at approximately 4 a.m. on August 17, 1985, and remained there until approximately 11 a.m., at which time Patrice ordered defendant to leave "[b]ecause he couldn't give [her] any explanation of where he had been." Their testimony further disclosed that defendant and Patrice were together from 4 a.m. until 11 a.m.

Defendant did not testify at trial.

On appeal, defendant first contends that the trial court committed reversible error in admitting the .9 millimeter, semi-automatic gun into evidence where testimony established that it was not the weapon used in the crime. We find that it was error to admit the gun into evidence, but hold that the error was harmless.

■■ ■ The determination of whether evidence is admissible with regard to relevancy is within the trial court's discretion, and its decision will not be reversed if the record indicates a sufficient basis for the decision. (*People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463

N.E.2d 696, 702; *People v. McQueen* (1983), 115 Ill. App. 3d 833, 837, 450 N.E.2d 921, 925; *People v. Gibson* (1982), 109 Ill. App. 3d 316, 325, 440 N.E.2d 339, 344; *People v. Jones* (1982), 108 Ill. App. 3d 880, 884, 439 N.E.2d 1011, 1015; *People v. Miller* (1981), 98 Ill. App. 3d 453, 458, 424 N.E.2d 624, 628.) It is well established, however, that a weapon found in a defendant's possession when arrested may be admitted only where the weapon bears a connection with the charged offense. *(People v. Ostrand* (1966), 35 Ill. 2d 520, 525-26, 221 N.E.2d 499, 503, *rev'd on other grounds People v. Bracey* (1972), 51 Ill. 2d 514, 283 N.E.2d 685; *McQueen,* 115 Ill. App. 3d at 838, 450 N.E.2d at 925-26; *People v. Brown* (1981), 100 Ill. App. 3d 57, 69, 426 N.E.2d 575, 582.) Case law dictates that such a connection exists where the weapon is "suitable" for the commission of the crime charged. *(People v. Magby* (1967), 37 Ill. 2d 197, 226 N.E.2d 33; *McQueen,* 115 Ill. App. 3d 833, 450 N.E.2d 921; *People v. Goodman* (1982), 109 Ill. App. 3d 203, 440 N.E.2d 345; *People v. Pointer* (1981), 93 Ill. App. 3d 1064, 418 N.E.2d 1; *People v. Braxton* (1980), 81 Ill. App. 3d 808, 401 N.E.2d 1062; *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528; *People v. Smith* (1974), 18 Ill. App. 3d 859, 310 N.E.2d 734.) Thus, where the defendant on arrest possesses a weapon similar to the weapon described by a witness, the recovered weapon may be admissible even though the witness cannot identify it as the perpetrator's weapon, thereby permitting a jury to infer from the defendant's possession of a suitable weapon that the weapon recovered was the one used to commit the offense. See *People v. Kincy* (1982), 106 Ill. App. 3d 250, 435 N.E.2d 831.

The question before us is whether a gun may be admitted under the above case law where eyewitness testimony specifically excludes the gun as being used in the offense. While direct evidence in the form of ballistics reports was not available in the instant case to exclude the admission of the gun in issue (see *McQueen,* 115 Ill. App. 3d 833, 450 N.E.2d 921; *Wade,* 51 Ill. App. 3d 721, 366 N.E.2d 528), Leroy's testimony on cross-examination specifically excluded the .9 millimeter gun as the gun utilized in commission of the attempted murder offense. Leroy described the gun used to shoot his wife as being a bluesteel, large, wooden-handled revolver. During cross-examination, defense counsel showed Leroy the .9 millimeter gun, and the following colloquy ensued:

"Q. [Defense attorney]: I show you People's Exhibit 10 for identification. This is not the gun, is it?

A. [Leroy Powell]: That's not the gun that he did the shooting with.

Q. This is not a bluesteel gun?
A. No, it is not.
Q. It does not have wooden handles?
A. No, it does not.
Q. It is not a revolver?
A. No, it's not.
Q. This is not the gun that your wife was shot with?
A. No."

At the pretrial hearing on defendant's motion *in limine* to exclude the gun, the State assured the trial court that during trial the suitability of the weapon would be established. The following dialogue contained in the record evidences the State's assurance on this issue:

"THE COURT: What will you expect [Leroy] to say?

MR. BEUKE [Assistant State's Attorney]: I will expect him to say that the gun that was produced by the defendant when the shooting occurred was a large gun, and that's it.

I don't expect that he will say a .357 Magnum bluesteel revolver.

I think [Leroy] will say that the incident, and the way it occurred when [defendant] produced the gun, happened so fast that he couldn't tell what kind of gun [defendant] had in his hand, a .38, .32, .357."

Based upon the testimony elicited from Leroy at trial, wherein Leroy described the weapon and specifically excluded the gun as being the weapon used in the commission of the crime, we find that it was error for the trial court to admit the gun into evidence.

The State's reliance on *People v. Ostrand* (1966), 35 Ill. 2d 520, 221 N.E.2d 499, to support its position that the gun was properly admitted into evidence is misplaced. Unlike the instant case, the victim in *Ostrand* described the gun in issue as a "snub-nosed pistol." Thereafter, the arresting officer testified that he would not classify the weapon which he recovered at the time of defendant's arrest as a "snub-nosed" gun. Because the gun recovered was similar to the gun that the victim described, the court determined that it was properly admitted into evidence. (*Ostrand*, 35 Ill. 2d 520, 221 N.E.2d 499.) The facts before us dictate a different result. Leroy did not merely testify that defendant used a weapon or give a general description of the weapon, *i.e.*, "a revolver." Instead, he unequivocally testified that the .9 millimeter gun was not the weapon used to commit the crime and gave a detailed description of the gun—a bluesteel, large, wooden-handled revolver.

■ Notwithstanding the above, we believe that any error here

was harmless. A trial error will be deemed harmless where the evidence supporting defendant's conviction is so overwhelming that the defendant's conviction would result even if the error were eliminated. (*People v. Grant* (1979), 69 Ill. App. 3d 940, 944, 387 N.E.2d 1087, 1091; *People v. Blackman* (1976), 44 Ill. App. 3d 137, 141, 358 N.E.2d 50, 52-53.) Admitting the gun into evidence here could not have reasonably affected the verdict in light of the overwhelming testimony at trial of defendant's guilt. We additionally mention that any inference that the jury was permitted to draw from the improperly admitted gun was significantly reduced by the fact that the gun was not submitted to the jury during deliberations.

Defendant next contends that he was denied a fair trial because he was not allowed to confront alleged nonverbal testimony, which was improperly presented to and considered by the jury. Specifically, defendant argues that Gladys, while sitting in her wheelchair in the spectator section of the courtroom, "demonstrated, by means of highly communicative facial expressions and gestures, her accusatory and hostile feeling towards the defendant," which were described by the jury foreman as "looks which could kill." At sentencing, during post-trial motions, defendant petitioned the court for an evidentiary hearing as to the extent that the jury considered Gladys' expressions. The trial court denied defendant's petition.

■ In addressing this argument, we note our supreme court's decision in *People v. Holmes* (1978), 69 Ill. 2d 507, 511-12, 372 N.E.2d 656, 658, where the court enunciated the circumstances in which the testimony or affidavit of a juror can be offered in an attempt to impeach a jury verdict. These situations fall into two categories:

"In the first category are those instances in which it is attempted to prove by a juror's testimony or affidavit the motive, method or process by which the jury reached its verdict. These, almost without exception, have been held inadmissible. [Citations.] The second category involves those situations in which the testimony or affidavit of a juror is offered as proof of conditions or events brought to the attention of the jury without any attempt to show its effect on the jurors' deliberations or mental processes." (69 Ill. 2d at 511-12, 372 N.E.2d at 658.)

In *Holmes*, the court held that the trial court erroneously refused to consider the allegations contained in the defendant's motion for a new trial that several jurors improperly initiated their own investigation concerning certain critical identification evidence where a juror informed defense counsel and an assistant State's Attorney during informal discussion after the verdict that several of the jurors went to a

Florsheim shoe store to inspect various heels of shoes. *Holmes*, 69 Ill. 2d at 509, 372 N.E.2d at 660.

■ While our inquiry here is limited to determining whether the alleged facial expressions constituted extraneous prejudicial information brought to the jury's attention or whether they were an outside influence brought to bear upon any juror, the record is absent any evidence that gestures were made during trial. The trial judge stated that "[he] did not see any facial expressions of hostility." We believe that he was in the best position to view Gladys, who was seated in the spectator section of the courtroom. Moreover, it is unlikely that the jury could determine Gladys' intent from her facial expressions. Thus, we find no prejudice resulted to defendant by the court's refusal to subpoena jurors and to conduct an evidentiary hearing.

Defendant additionally argues that he was denied a fair trial as a result of improper prosecutorial comments during closing argument. First, defendant contends that the State committed reversible error by commenting on defendant's failure to call his girl friend, Robin Crump, as a witness. Defendant also claims that the State committed reversible error when it referred to Ricky Wade's and Sherri Williams' grand jury testimony.

■ To properly determine whether error occurred, the remarks must be viewed under the totality of the circumstances at trial. As to the first challenged remarks, during closing argument, defense counsel stated the following:

"MR. LEVIN [Defense Attorney]: The State had an awful lot of people around that they could have called as witnesses in this case. Leroy's testimony was that he had been selling drugs out of that apartment for some time. He would say that he has gone out on the street and encouraged people to buy drugs from them.

He's [*sic*] solicited the sale of drugs out of that apartment. There was business in that apartment probably day and night because we know that over five hundred dollars a day was being sold out of that apartment.

He must have known tens of people that have been to that apartment to buy drugs. Did he give the name of one of those persons?

MR. WEIGAND [Assistant State's Attorney]: Objection, Judge. There's no evidence.

THE COURT: Sustained. There is no evidence, and there's no evidence he was ever asked now, Mr. Levin. I'm going to sustain that objection.

MR. LEVIN: *Did any witnesses come forward to testify that they had ever seen [defendant] in that apartment? Not one.*
*We know that there were people in the apartment with Laurie Hamrick. Have you heard them testify?"* (Emphasis added.)

In response to defense counsel's argument, the State commented on the fact that defendant had not called his girl friend, Crump, as a witness. Specifically, the remarks were as follows: "Where's [Robin], ladies and gentlemen? Where's old Robin?"

■ The record discloses that defendant did not object to these statements during trial or in his post-trial motion. Despite his failure to properly preserve this issue for appeal, he urges this court to find that he has been prejudiced by the remarks. We find that defendant's failure to raise any objection on this issue effectively waives his right to appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) We further find that the plain error doctrine is inapplicable here, as the evidence is not closely balanced, nor is the comment of such magnitude that defendant was denied a fair trial. Moreover, the State's remarks were in reply and invited by defense counsel's argument, as evidenced above. See *People v. Dixon* (1982), 91 Ill. 2d 346, 350-51, 438 N.E.2d 180, 182-83; *People v. Simpson* (1984), 129 Ill. App. 3d 822, 838, 473 N.E.2d 350, 361; see also *People v. Plantinga* (1985), 132 Ill. App. 3d 512, 520-21, 477 N.E.2d 1299, 1304-05; *People v. Gaines* (1982), 104 Ill. App. 3d 974, 977, 433 N.E.2d 970, 972 (when alibi witness is injected into case by defendant, he is deemed unavailable to the prosecution and comment on the failure of such witness to testify is proper).

■ As to the State's comment that "Ricky Wade and Sherri Williams went in front of a grand jury in September of 1985," we again find that this comment was invited by defense counsel's argument alluding to the fact that the State had failed to call witnesses who lived with Laurie Hamrick. (See *Dixon*, 91 Ill. 2d at 350-51, 438 N.E.2d at 182-83; *Simpson*, 129 Ill. App. 3d at 838, 473 N.E.2d at 361.) The State's comment was not dwelled upon, and the trial court's interjection and instruction that the jury disregard any argument not based upon the evidence served to alleviate any potential prejudice to defendant. (See *People v. Faysom* (1985), 131 Ill. App. 3d 517, 523, 475 N.E.2d 945, 952.) Based upon the totality of the circumstances here, it cannot not be said that defendant was denied a fair trial as a result of this comment. See *People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804; *People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801.

■■ Defendant's final objection to prosecutorial comment is the State's directing the jury's attention to Gladys and Leroy Powell in order to show that they had an affectionate relationship with one another, thereby destroying defendant's theory of the case that Leroy shot Gladys. We find that it was not improper for the State to encourage the jury to draw inferences from the demonstrated affection since such argument was in rebuttal to defense counsel's argument that Leroy had in fact committed the attempted murder against Gladys.

In any event, any error as a result of the State's directing the jury's attention to Leroy and Gladys during trial was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's guilt. (See *Rowe*, 115 Ill. App. 3d at 327, 450 N.E.2d at 809.) Furthermore, the trial court instructed the jury not to consider closing argument as evidence and to disregard any argument not based upon the evidence, thereby further alleviating any alleged harm.

After reviewing all of the above comments, we find that there has been no showing that any of the remarks questioned by defendant influenced the jury and resulted in substantial prejudice (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881), that the remarks were a material factor in defendant's conviction, that they were so inflammatory as to deprive defendant of a fair trial or that the verdict would have been different had the comments not been made. We therefore conclude that no prejudicial error resulted from the State's comments.

Defendant also contends that he was denied a fair and impartial trial as a result of improper remarks made by the trial judge during *voir dire*. We similarly find this argument to be without merit. The trial judge's remarks are as follows:

> "You will note Mr. Jackson is in a wheelchair today. His being in a wheel chair does not relate to the alleged incident that I just talked to you about, it instead relates to some exercise function at the Cook County Department of Correction which he was engaged in the other day. So, it has nothing do [*sic*] with the case. But if you are wondering why the wheel chair, that's it."

Defendant further asserts that the trial judge referred to him as an "inmate."

■■ "Prejudice to the defendant must appear to be the probable result of the trial court's remarks or they must have been a material factor in the defendant's conviction to constitute reversible error." (*People v. Cobbins* (1987), 162 Ill. App. 3d 1010, 1028, 516 N.E.2d 382, 395, citing *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936-37,

449 N.E.2d 568, 573.) The remarks must convey to the jury that a witness is not credible or that the court assumes the defendant's guilt. *People v. Sprinkle* (1963), 27 Ill. 2d 398, 399-403, 189 N.E.2d 295, 298.

 The record here is devoid of any evidence that the trial court judge referred to defendant as an "inmate." The remarks quoted above were not improper, as they did not exceed the bounds of propriety during *voir dire*. The comments merely provided the jury with an explanation as to defendant's confinement to a wheelchair and were intended to prevent the jury from speculating that defendant's injury stemmed from the instant case.

 Defendant further argues that he was denied a fair trial because the jurors were permitted to view him in the lockup area when using a telephone in the sheriff's conference room, where there were various television monitors displaying the lockup area. This argument provides no basis to reverse defendant's conviction. Defendant's assertion lacks any factual support and is speculative, at best. Defendant is entitled to a "fair trial" not a "perfect trial." We hold that even had the jurors been able to view defendant in the lockup area, no substantial prejudice resulted so as to deprive defendant of a fair trial.

Next, we consider defendant's contention that the incompetence of his trial counsel denied him a fair trial as mandated under the sixth amendment of the United States Constitution (U.S. Const., amend. VI), requiring this cause be remanded for a new trial. To show counsel's incompetence, defendant directs us to the fact that defense counsel failed to request or submit a jury instruction on the credibility of a drug addict's testimony. Specifically, defendant contends that there was sufficient evidence to warrant an instruction as to a drug addict's credibility. We reject defendant's contention.

The record discloses that the State offered an instruction to assist the jury in its deliberations on this issue, which states the following, in pertinent part:

> "[T]estimony of a narcotics addict should be scrutinized with caution[;] however, his testimony may be sufficient to sustain a conviction if credible under the surrounding circumstances ***."

Subsequently, the trial court asked defense counsel, "[D]o you want it [to be] given?" Defense counsel responded, "No, I'm not requesting it be given."

 ██ In order to succeed on an ineffective assistance of counsel claim, a defendant must satisfy a two-pronged test, announced by

the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by Illinois in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. First, counsel's performance must fall well below an objective standard of reasonableness. (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255.) Second, even if the defendant meets the first requirement, *Strickland* requires reasonable probability that but for counsel's errors, the result of the proceeding would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *Albanese*, 104 Ill. 2d at 525-27, 473 N.E.2d at 1255.) When applying the *Strickland* standard, a court is to view the totality of counsel's conduct in light of all the circumstances and under a strong presumption of adequacy and reasonableness. (*People v. Davis* (1986), 151 Ill. App. 3d 435, 443, 502 N.E.2d 780, 785.) The inquiry into the competency of counsel will not generally extend to the exercise of judgment, discretion, trial tactics or strategy even where appellate counsel or the reviewing court might have handled the matter differently. *People v. Greer* (1980), 79 Ill. 2d 103, 122, 402 N.E.2d 203, 212; *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 882, 522 N.E.2d 1317, 1323.

██ Based upon the circumstances here, counsel's decision not to have the jury instruction submitted was a mere tactical judgment. (See *Greer*, 79 Ill. 2d at 122, 402 N.E.2d at 212; *Schmidt*, 168 Ill. App. 3d at 882, 522 N.E.2d at 1323.) Defendant has failed to satisfy his burden under *Strickland* to establish his ineffective assistance of counsel claim.

Defendant next argues as error the trial court's admission of certain hearsay evidence. The objected-to evidence concerns testimony given by police officers as to descriptions of the assailant, which were provided to them by Leroy. Defendant argues that this testimony was offered to impermissibly bolster Leroy's credibility, the prejudice of which was compounded during closing argument. The State maintains that defendant has waived this issue on review by failing to object at trial or in his during post-trial motion. We agree.

██ To properly preserve an issue for appeal, "*[b]oth* a trial objection and a written post-trial motion *** are required.*" (Emphasis in original.) (*Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1130.) Defendant's failure to properly object to the alleged errors has precluded our review of this issue.

██ Even assuming *arguendo* that the plain error exception to the waiver rule applies here, defendant's contention must still fail. It is well established that an out-of-court statement not offered for the

truth of the matter asserted is not hearsay. (*People v. Loggins* (1985), 134 Ill. App. 3d 684, 480 N.E.2d 1293.) "A statement used in a criminal prosecution to detail the course of a police investigation, not to prove the truth of the matter asserted, is not hearsay." (*Loggins*, 134 Ill. App. 3d at 692, 480 N.E.2d at 1299, citing *People v. Price* (1979), 79 Ill. App. 3d 1112, 398 N.E.2d 1158; see also *People v. Dunning* (1980), 88 Ill. App. 3d 706, 410 N.E.2d 1052; *People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.) A police officer may testify to the circumstances of an investigation to show the manner in which the witness came to identify the defendant. *People v. Bryant* (1984), 123 Ill. App. 3d 266, 275, 462 N.E.2d 780, 786.

 The officers' testimony here was proper on the basis that it detailed the course of the officers' investigation and the means by which Leroy identified defendant/"Rabbit." (See *Price*, 79 Ill. App. 3d 1112, 398 N.E.2d 1158.) Consequently, the State's comments on this evidence during closing argument were also proper. See *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.

Finally, defendant contends that the State's witnesses' testimony was incredible and not corroborated by any physical evidence; therefore, he was not proved guilty beyond a reasonable doubt.

 It is axiomatic that a reviewing court will not substitute it judgment for that of the trier of fact, whose duty is to weigh the evidence and credibility of the witnesses and to resolve any inconsistencies drawn from the evidence. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.) When a defendant claims he was convicted with insufficient evidence, the evidence must be reviewed in a light most favorable to the prosecution and the court must determine whether any rational trier of fact could have found defendant guilty of the crime beyond a reasonable doubt. *Young*, 128 Ill. 2d 1, 538 N.E.2d 461; see also *People v. Welacha* (1989), 186 Ill. App. 3d 860, 542 N.E.2d 927.

 After reviewing the record, we find that defendant was convicted of attempted murder beyond a reasonable doubt and that this verdict is unassailable to the extent that it reflects a credibility determination. (*People v. Puente* (1984), 125 Ill. App. 3d 152, 157, 465 N.E.2d 682, 687.) The jury heard the witnesses' accounts of the shooting and made its determination as to credibility. It is unnecessary to repeat *verbatim* the testimony of all the witnesses at trial. Our review of the record discloses the following ample evidence to support defendant's conviction here: Leroy, an eyewitness to the crime, testified that defendant shot Gladys in the head and also shot at him, but missed. Laurie testified that she overheard defendant tell Ricky that he was going to kill Leroy and Gladys. Laurie's testimony further dis-

closed that subsequent to defendant's conversation with Ricky she "heard a shot, *** and then a couple of seconds later, [she] heard two shots, and then [she] heard like a body fall, *** and *** [she] heard [defendant] running down the back stairs." She subsequently looked out the window of her apartment and observed defendant running from the back stairway. In light of the evidence presented here, we hold that no basis exists for disturbing defendant's conviction.

For the foregoing reasons, we affirm defendant's conviction of attempted murder.

As part of our judgment, pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, and *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, we grant the State's request that defendant be assessed $75 for the costs of this appeal.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.