NOTICE

Decision filed 05/20/14. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2014 IL App (5th) 120216

NO. 5-12-0216

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 11-CF-541 |
| | ) | |
| RAY TERRANCE SLACK, | ) | Honorable |
| | ) | Ann Callis, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Justices Spomer and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1     After a jury trial in the circuit court of Madison County, defendant, Ray Terrance Slack, was convicted of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) and armed robbery (720 ILCS 5/18-2(a)(1) (West 2010)).  He was sentenced to consecutive terms of 40 years in the Department of Corrections on the murder conviction and 7 years on the armed robbery conviction.  The two issues raised by defendant on direct appeal are: (1) whether defendant received a fair trial and (2) whether the trial court erred in refusing to instruct the jury on the lesser-included offense of theft.  We affirm.

1

¶ 2                                    FACTS

¶ 3     Defendant was charged by indictment with first-degree murder and armed robbery of the victim, Bob Garrett.  The victim was 77 years old, 5 feet 7 inches tall, and weighed between 140 and 150 pounds.  Garrett was wearing a catheter when he was killed and had physical ailments, including coronary artery disease and emphysema.

¶ 4     The victim's neighbor, Mark Cope, testified that he lives on Carl Street in Alton. It is a dead-end street, and the only other residents of the street were Cope's father and the victim.  Around midnight on March 16, 2011, Cope was on his porch smoking when he saw a pickup truck with its lights and engine off parked on the street.  There was a man in the driver's seat and a man outside the truck who appeared nervous.  Cope shined a flashlight on the man outside the truck, which made the man even more nervous.  The truck lights came on, and the truck started to back up.  Cope dialed 911.  Cope then went to the victim's home and knocked on the door, but got no response.  Cope contacted the police again and asked them to check on the victim's welfare.

¶ 5     Officers Espinoza and McCray of the Alton police department responded to the victim's house where they found the victim lying dead in the backyard with a wallet next to him.  There were no weapons near the body.  The officers could not gain entry to the house due to a large amount of debris blocking both the front and back doors.  The officers noticed that the glass on the back door was broken.

¶ 6     Detective Metzler processed the scene.  He did not find a gun or any weapons in the victim's house.  The victim possessed a FOID card, but it expired on March 1, 2001.

2

Metzler obtained a blood standard card from the victim and a birdbath, which he sent to the crime lab for analysis.

¶ 7    Lieutenant Simmons of the Alton police department testified he responded to a call of a suspicious vehicle on Carl Street and Yeakel Avenue around 1 a.m. on the date in question. Simmons stopped a pickup truck that was traveling at a high rate of speed. Herbert Slack was the driver. The passenger was defendant, who identified himself as Ray M. Slack. Simmons let the men leave after he determined neither of them had any outstanding warrants. However, Simmons was then informed by his dispatcher that Ray T. Slack had an outstanding warrant. Simmons looked at a photograph of Ray T. Slack and determined that the passenger was in fact Ray T. Slack, not Ray M. Slack. Simmons stopped the truck again and took defendant into custody. Defendant smelled of alcohol and never mentioned he had been part of a fight or a physical confrontation.

¶ 8    Lieutenant Golike testified he was assigned to investigate the victim's death. He learned from other officers that the coat defendant was wearing when he was arrested appeared to have blood on it. Golike waited until approximately 7:15 a.m. to interview defendant because he knew defendant was intoxicated when he was arrested at 1:10 a.m. In addition to Golike, Detective Gary Cranmer took part in the initial interrogation of defendant.

¶ 9    People's Exhibit 13 is a videotape of the interrogation, which lasted approximately 68 minutes. Defendant admitted he consumed a lot of alcohol the previous evening and said he could not remember much. He denied any type of confrontation with a white

3

male, denied knowing the victim, and said he had never been to Carl Street. Cranmer told defendant that he appeared to have blood on his hand and showed him the jacket and the shoes he was wearing when he was brought into the station, both of which had blood on them. Defendant denied any knowledge of how the blood might have gotten on him or his attire. Defendant allowed Metzler to take a swab from his right hand and buccal swabs. It was later determined from DNA profiles that the blood recovered from defendant's jacket and hands matched the victim's DNA profile.

¶ 10   Over halfway through the interview, defendant admitted he knew the victim, but did not remember going to his house the previous evening. Defendant said he had previously taken prostitutes to the victim at the victim's request. At 8:22 a.m. defendant said he did not feel like speaking anymore, and the interview was terminated.

¶ 11   Detective Cooley testified that later that day he received from a jailer a message that defendant wanted to speak with him. Cooley met defendant in the interview room at 6:50 p.m., and a second interview was videotaped. Defendant admitted he was drinking with his cousin Herb and that they smoked some crack. After they ran out of alcohol, defendant went to the victim's house to borrow some money. He admitted that his sister previously dated the victim and that the victim was "like family." Defendant knocked on the victim's door. The victim came out, but refused defendant's request to borrow money. Defendant got mad and threw something and broke the victim's window. According to defendant, the victim ran down the stairs and defendant thought he had something and was going to hit him, so he punched the victim in the face. When the victim got up, defendant hit him again and then used a bricklike object, which he later described as part

4

of a birdbath. The victim was still conscious, so defendant picked up a piece of string that he found nearby and choked the victim.

¶ 12 Defendant said he was extremely drunk, was not thinking straight, and would not have gotten into the fight if he had been sober. Defendant got scared after he realized the victim was not moving, but noticed the victim's wallet lying on the ground and removed the cash from the wallet. Defendant denied going to the victim's house with the intent to steal from the victim and said he only took the money after he noticed the wallet on the ground. Defendant said he knew the victim owned a pistol and believed that the victim might have had it when he charged at him after defendant broke the window. Defendant claimed the victim shot at him on a previous occasion. Defendant said he choked the victim to "calm his ass down" because he did not want to hit him anymore with the birdbath.

¶ 13 Defendant threw the birdbath pedestal over the fence, and the police later recovered it. A photograph was introduced into evidence and shows blood on the large concrete pedestal. The DNA profile of the blood recovered from the birdbath matched the victim's.

¶ 14 Defendant then walked and met up with Herb, his cousin. He continued to drink and went with Herb to get more crack. Later in the evening, defendant told Herb he hit an old white man in the head with a brick. Defendant wanted to go back to the house to check on the victim, while Herb wanted to go steal something from the victim's residence. When they went back to the victim's house, a neighbor shined a light on the

truck, and they got scared and left. This second interview lasted approximately 45 minutes.

¶ 15  Cooley testified that he received another message that defendant wanted to speak to him again, so Cooley conducted a third interview with defendant on March 17, 2011. This interview was also videotaped and shown to the jury. Defendant said he went to borrow five dollars from the victim. He said he borrowed money from the victim at least 60 times and the victim would give him money 7 out of 10 times that he asked. On the night in question, the victim refused to give defendant money, so defendant threw a beer he was carrying at a window in the back of victim's home and broke it. Defendant said the victim then ran down the steps and reached behind his back. Defendant thought the victim might have a pistol or a knife. Defendant hit the victim and a fight ensued. While they were fighting the victim asked, "Why you doing this Ray?" Defendant told the victim he thought the victim was going to shoot him, and the victim did not deny having a gun, but kept reaching behind his back. However, defendant admitted that once he got the victim on the ground, he knew the victim did not have a gun.

¶ 16  The victim started yelling for help and defendant wanted to stop him from reporting the incident. Defendant said the victim was strong for his age and recounted an incident in which the victim got in a fight with defendant's cousin. Defendant said he never intended to rob or kill the victim. He thought the victim was just out cold. When he was driving around with Herb later that evening, he told Herb he knew where they could get some money. He said there were at least two hours between the time he was at the victim's house alone and the time he went back with Herb.

6

¶ 17    Dr. Raj Nanduri performed an autopsy on the victim and testified the victim died as the result of strangulation and blunt-force trauma. Several autopsy photographs were introduced into evidence. Defense counsel objected to People's Exhibit 42, an internal photograph of the victim's ribs after his chest plate was removed, and People's Exhibit 57, a photograph of the victim's head after the scalp was peeled back to show the injuries beneath his scalp. Both objections were overruled. Nanduri testified that the victim's injuries included tears to the side of his head, a broken nose, a broken orbital bone, a broken cheek bone, and a massive hemorrhage under the scalp. The victim's hyoid bone was broken, which occurs during strangulation.

¶ 18    Defendant did not testify. The defense attempted to call defendant's sisters, Natalie and Jacqueline, to support defendant's theory of self-defense. The State filed a motion *in limine* to exclude their testimony, which the trial court granted. In an offer of proof, defense counsel stated that both sisters would testify that they knew the victim to carry a gun. Natalie, who dated the victim for 12 to 14 years, would testify that she saw the victim threaten defendant with a gun in 1996. Natalie also would testify that she saw the victim point a gun at her cousin in an unrelated incident.

¶ 19    The jury was instructed on self-defense and second-degree murder based on an unreasonable belief in self-defense. The trial court denied the defense's proffered theft instruction. The jury found defendant guilty of first-degree murder and armed robbery. After a sentencing hearing, the trial court sentenced defendant to consecutive terms of 40 years and 7 years. Defendant now appeals.

7

¶ 20                              ANALYSIS

¶ 21    The first issue on appeal is whether defendant received a fair trial.  Defendant contends he was denied a fair trial because the trial court barred admission of evidence that would have supported his theory of self-defense and admitted gruesome autopsy photographs that were needlessly prejudicial.  We disagree.

¶ 22    Defendant asserts that the question of whether he was entitled to present the testimony of his sister, Natalie Slack, to support his claim of self-defense is subject to *de novo* review.  However, it is well settled that the admissibility of evidence lies within the sound discretion of the trial court, and its decision will not be overturned on appeal absent an abuse of discretion.  *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010); *People v. Ward*, 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702 (1984).  An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court.  *Becker*, 239 Ill. 2d at 234, 940 N.E.2d at 1142.

¶ 23    In the instant case, the trial court was confronted with the proferred testimony of Natalie Slack who would have testified the victim carried a gun and that in 1996, she saw the victim point a pistol at defendant.  As to the incident involving her cousin, no further time frame was given.  A trial court may bar evidence on the grounds of relevancy if the evidence is remote, uncertain, or speculative.  *People v. Morgan*, 197 Ill. 2d 404, 456, 758 N.E.2d 813, 843 (2001).  We agree with the State that with one act occurring 15 years prior to the instant incident and the other act not even given a time frame, the trial

8

court was within its discretion to refuse to admit Natalie Slack's testimony on the basis of remoteness and uncertainty. Finally, even assuming *arguendo* that the trial court erred in refusing to admit Natalie's testimony, we find such error harmless.

¶ 24 Error is deemed harmless where the evidence supporting a defendant's conviction is so overwhelming that the defendant would have been convicted even if the error was eliminated. *People v. Jackson*, 195 Ill. App. 3d 104, 114, 551 N.E.2d 1025, 1030 (1990). Here, even if Natalie Slack was allowed to testify, it would not have overcome the overwhelming evidence that defendant was the initial aggressor. Defendant admitted he started the confrontation when the victim refused to loan him money. Defendant became angry and threw his beer can at the victim's window, causing it to shatter. The victim, who was much older, smaller, and in worse health than defendant, then allegedly came toward defendant. While defendant claimed the victim had a weapon behind his back, he also admitted during the third interview that once the victim was on the ground, he realized the victim was not armed. Nevertheless, defendant beat the victim senseless, using not only his hands but also a concrete birdbath and, ultimately, a piece of string or rope to strangle the victim. Accordingly, defendant's own statements show that he was the initial aggressor.

¶ 25 An initial aggressor is not entitled to use deadly force in self-defense unless he or she completely withdraws from the altercation so that the victim's actions constitute a separate aggression. *People v. Armstrong*, 273 Ill. App. 3d 531, 534, 653 N.E.2d 17, 18-19 (1995). Here, defendant failed to show that he withdrew from the altercation, but rather admitted that he ultimately strangled the victim. Under these circumstances, we

find the trial court did not commit reversible error in refusing to admit the testimony of Natalie Slack.

¶ 26 Defendant next contends the trial court erred in admitting two autopsy photographs, People's Exhibit 42 and People's Exhibit 57, because the photos were "gruesome" and "needlessly prejudicial." We disagree.

¶ 27 Whether a jury should be allowed to see photographs of a decedent is a decision which lies within the sound discretion of the trial court. *People v. Heard*, 187 Ill. 2d 36, 76-77, 718 N.E.2d 58, 80 (1999). Photographs of a decedent may be introduced if they are used to prove the nature and extent of the injuries, the manner and cause of death, or aid in the understanding of a pathologist. *Heard*, 187 Ill. 2d at 77, 718 N.E.2d at 81.

¶ 28 People's Exhibit 42 is an internal photograph of the victim's ribs after his chest plate was removed, and People's Exhibit 57 is a photograph of the victim's head after the scalp was peeled back. Both photographs were relevant to show the nature and extent of the victim's injuries and the amount of force used by defendant in inflicting the injuries upon the victim. Moreover, both photographs helped in understanding the pathologist's testimony. Dr. Nanduri specifically testified with regard to People's Exhibit 42:

"You can see there is a lot of black discoloration around the ribs. The black discoloration is from the fractures of the ribs he had, and you have an internal control. You can see these other areas there is no bleeding. So, that's the way the normal should look whereas the bleeding part is the fracture."

¶ 29 Dr. Nanduri then explained that the dark black part in the photograph showed the

10

victim had three broken ribs.

¶ 30 With regard to People's Exhibit 57, Dr. Nanduri explained that previous pictures showed lacerations or tears on the outside of the victim's head, but this photograph showed the injuries underneath the scalp, which she described as a "massive hemorrhage, crushing injury, blunt force trauma." It showed "a lot of bleeding in the scalp." Therefore, the photographs were relevant not only to show the amount of force used by defendant but also to assist the jury in understanding Dr. Nanduri's testimony. Under these circumstances, we cannot say the trial court abused its discretion in admitting either People's Exhibit 42 or 57.

¶ 31 The final issue raised in this appeal is whether the trial court erred in refusing to instruct the jury on the lesser-included offense of theft. Defendant argues there was sufficient evidence presented to allow the jury to find defendant guilty of theft and not guilty of armed robbery so that a theft instruction was warranted.

¶ 32 A defendant is entitled to have the jury instructed on a less serious offense which is included in the charged offense if: (1) the charging instrument describes the lesser offense and (2) the evidence adduced at trial rationally supports the conviction on the lesser-included offense. *People v. Ceja*, 204 Ill. 2d 332, 359-60, 789 N.E.2d 1228, 1246-47 (2006). Because the decision to allow a jury instruction is within the province of the trial court, a reviewing court generally reviews the refusal of a proposed instruction for abuse of discretion. *People v. Tijerina*, 381 Ill. App. 3d 1024, 1030, 886 N.E.2d 1090, 1097 (2008). However, where the question presented is whether the defendant met "the

11

evidentiary minimum" for a certain jury instruction, it is best categorized as a question of law and reviewed *de novo*. *Tijerina*, 381 Ill. App. 3d at 1030, 886 N.E.2d at 1097.

¶ 33 There is no dispute that theft from a person is a lesser-included offense of armed robbery. Here, defendant insists the evidence was sufficient to warrant a theft instruction because his taking the money from the victim's wallet was a "crime of opportunity" or an afterthought. However, under the evidence presented, a jury simply could not reasonably infer that defendant acted without the use of force, which is necessary for armed robbery. See 720 ILCS 5/18-2(a)(1) (West 2010). The evidence clearly shows that defendant took the victim's money only after the use of force. Based upon the record before us, a jury instruction on the noncharged lesser-included offense of theft would have been inappropriate, and the trial court did not err in refusing to give a theft instruction.

¶ 34 For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.

¶ 35 Affirmed.

2014 IL App (5th) 120216

NO. 5-12-0216

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,     )     Appeal from the
                                         )     Circuit Court of
        Plaintiff-Appellee,              )     Madison County.
                                         )
v.                                       )     No. 11-CF-541
                                         )
RAY TERRANCE SLACK,                      )     Honorable
                                         )     Ann Callis,
        Defendant-Appellant.             )     Judge, presiding.
_____

**Opinion Filed:**          May 20, 2014
_____

**Justices:**          Honorable Richard P. Goldenhersh, J.

                       Honorable Stephen L. Spomer, J., and
                       Honorable Judy L. Cates, J.,
                       Concur
_____

**Attorneys**          Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy
**for**                Defender, Peter Sgro, Assistant Appellate Defender, Office of the State
**Appellant**          Appellate Defender, First Judicial District, 203 North LaSalle, 24th Floor,
                       Chicago, IL 60601
_____

**Attorneys**          Hon. Thomas D. Gibbons, State's Attorney, Madison County Courthouse,
**for**                157 North Main Street, Suite 402, Edwardsville, IL 62025, Patrick
**Appellee**           Delfino, Director, Stephen E. Norris, Deputy Director, Whitney E. Atkins,
                       Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730
                       East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864
_____