NOTICE
Decision filed 05/11/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180144-U

NO. 5-18-0144

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 16-CF-229 |
| | ) | |
| BRIAN FERGUSON, | ) | Honorable |
| | ) | Bradley T. Paisley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*: Because the circuit court did not, in response to the defendant's *pro se* posttrial claim of ineffective assistance of counsel, conduct an inquiry into such allegation pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny, we remand with directions for the court to conduct further proceedings.

¶ 2   This is a direct appeal from the circuit court of Christian County. The defendant, Brian Ferguson, was convicted of home invasion and residential arson. On February 23, 2018, he was sentenced to a total of 22 years' imprisonment followed by 5 years of mandatory supervised release (MSR). The defendant raises four points on appeal: (1) that the trial court erred in failing to conduct an inquiry into his *pro se* posttrial claim that

1

defense counsel was ineffective, (2) that the court abused its discretion in admitting hearsay evidence, (3) that he was denied effective assistance of counsel, and (4) that he was denied a fair sentencing hearing. For the reasons that follow, we remand with directions.

¶ 3    The defendant raises multiple issues on appeal that concern his convictions and sentences. Because we find the first issue meritorious and dispositive, we need not address the remaining issues.

¶ 4                              I. BACKGROUND

¶ 5    On November 20, 2016, the defendant was charged with one count of home invasion (count I) and one count of arson (count II). An amended information was filed on December 19, 2016, and a second amended information was filed on May 18, 2017. Pursuant to the second amended information, count II charged the defendant with residential arson. Count I alleged that the defendant "knowingly, and without authority, entered the dwelling place of Jacqueline S. Anderson, *** knowing or having reason to know Jacqueline S. Anderson to be present within that dwelling place, and while armed with a dangerous weapon, a knife, used force or threatened imminent use of force in violation of 720 ILCS 5/19-6(a)(1) [(West 2016)]." Count II alleged that the defendant "while committing an arson *** knowingly totally damaged the dwelling place of Jacqueline S. Anderson *** in violation of 720 ILCS 5/20-1(b) [(West 2016)]."

¶ 6    Prior to trial, the defendant told the trial court that he was feeling inadequately represented. The defendant said he told trial counsel he wanted people to be subpoenaed to testify on his behalf. In response to this request, the defendant said trial counsel told him "the county was broke." Defense counsel denied making that statement. Counsel also

said he attempted to contact all the potential witnesses the defendant wanted him to contact, but he did not have a phone number or address for one person. The defendant stated that defense counsel only spent "one week looking for people to subpoena for witnesses."

¶ 7 On May 18, 2017, defense counsel filed a motion to withdraw, stating there was a breakdown in communication, and he could no longer effectively represent the defendant. The trial court denied counsel's motion. The defendant again told the court that there was a witness he wanted contacted, but trial counsel said he did not have a telephone number or address to get ahold of the alleged witness. The next day, the defendant again expressed his concerns about having no witnesses to testify on his behalf. The court stated that it had heard those concerns before, and if the defendant could identify the location of the witnesses, then trial counsel would be obligated to speak with them. The defendant said that he could give trial counsel the name of a man whom he wanted as a witness along with a map with the man's location. Trial counsel stated that if he had a map, he would look at it. The defendant again expressed his concerns that the trial was to begin in a few days. The court said it would give the defendant leeway if the potential witnesses were identified and he wanted them to testify.

¶ 8 On May 22, 2017, the defendant's three-day jury trial commenced. Officer Jason Cole of the Pana Police Department testified that he was dispatched to the victim's residence around 4:21 p.m. on November 20, 2016. Officer Cole stated that the victim had informed the dispatcher that the defendant cut his own throat and lit her house on fire. Prior to arriving at the victim's residence, Officer Cole learned via dispatch that another officer had encountered the defendant, so he went to assist at that location. Officer Cole testified

3

that the defendant's residence was "directly across the lake" from the victim's home. After the defendant was apprehended, he was taken to the hospital. Thereafter, a search was conducted of the defendant's residence, and a knife was recovered. Items of the defendant's clothing that had an odor of gasoline were also collected from his residence.

¶ 9 Chief Daniel Bland testified that, on his way to the victim's residence, he observed the defendant walking toward him. The defendant had blood on the front of his shirt and lacerations on his neck. Chief Bland testified that the defendant's residence was near the victim's residence, and he observed the defendant walk to his residence. The homes were visible from one another, and it would take a few minutes to walk between the two. After he observed the defendant walk to his house, Chief Bland contacted Officer Cole so they could secure the perimeter of the defendant's property. During the execution of the search warrant on the defendant's home, Chief Bland was present and took photographs that were introduced into evidence.

¶ 10 Officer Adam Ladage testified that his role in the investigation was to recover evidence from the scene. Officer Ladage collected the clothes the victim was wearing during the incident, and he did not recall smelling gasoline on them.

¶ 11 Terry Ooms of the Illinois State Fire Marshal's Division of Arson Investigation testified as an expert witness on behalf of the State. Ooms explained how he conducted his arson investigation, which included taking numerous photographs and samples from the victim's residence. Ooms observed two structures that were burned, the victim's residence and shed, as well as three vehicles in the driveway. Ooms opined that the residential structure was totaled. Ooms's canine partner examined the exterior of the

4

victim's residence, and "she made multiple positive indications for the presence of flammable or ignitable liquids in the area." Ooms also detected a strong odor and observed visible signs of petroleum products in the area where the canine had indicated. Ooms testified that the samples he retrieved tested positive for the presence of gasoline, an accelerant. Based on Ooms's investigation, he concluded that the fire at the victim's residence was intentionally set.

¶ 12    Randy Bruns testified that he knew the defendant for 20 years. During the first week of October 2016, Bruns had a conversation with the defendant, during which Bruns asked the defendant how he was doing. In response to a hearsay objection, the trial court ruled that Bruns's testimony about his conversations with the defendant would be admitted for the purpose of showing the defendant's state of mind. Bruns then testified that the defendant said he was not doing well. The defendant told Bruns that he married the victim,[1] she subsequently went to a retreat, and she did not want anything to do with him when she returned. The court then instructed the jurors that they were not allowed to consider the preceding testimony for the truth of what was asserted, but only to show the defendant's state of mind at the time he made the statement. Bruns also testified that he saw the defendant on the morning of the incident, and the defendant looked "hollowed," but he was not threatening or angry.

---

[1]There was no evidence at trial that the defendant was in fact married to the victim. The State sought to introduce the defendant's hearsay statement that he was married to the victim to show his state of mind at the time he made the statement. The State argued that there was a "triggering event," where the victim said she wanted to end their relationship, the defendant's behavior got worse, and he became erratic, all of which showed his intent for what happened on November 20, 2016. The trial court ruled that the statement would be admitted for the purpose of showing the defendant's state of mind.

¶ 13    Two other witnesses testified that they observed the defendant walking in the Pana Lake area on November 20, 2016. The defendant had blood on his shirt, and he would not let either of them assist him.

¶ 14    Mary Monroe testified that she had known the defendant since they were children. When the State asked Monroe about a conversation they had, trial counsel made a continuing objection to any testimony about conversations between Monroe and the defendant. Monroe then testified that the defendant called her about two weeks before the incident giving rise to his charges. The defendant was upset and did not understand why the victim did not want him to come over. The defendant told Monroe that he went to the victim's home, and she asked him to leave. Monroe had a similar conversation with the defendant a few days before the incident. During the second conversation, the defendant said he went to the victim's door, and she told him to leave or she would call the police. The trial court then gave a limiting instruction that the jury was only to consider Monroe's testimony about the defendant's statements as evidence of his state of mind and "any knowledge that he may have had about being able to go to that property."

¶ 15    The victim testified that she met the defendant in April 2016. They began a physical relationship in May, but it ended in July because she did not like the defendant's behavior. At that time, the victim asked the defendant to decrease his visits to her home because he had been going there every day. Instead of decreasing, however, the defendant's visits increased drastically and at times she would tell him to leave. The victim only invited the defendant to her home once during their relationship, and that was in July.

¶ 16    The victim testified about unwanted visits from the defendant during the month of September. When the victim returned from her vacation at the end of September, she told the defendant she did not want contact with him anymore. The defendant responded that he wanted it in writing, so the victim wrote it down for him. The defendant then told the victim that "he wanted [her] gone." The defendant applied for an order of protection against the victim, but it was denied. The unwanted interactions with the defendant continued during the month of October. The victim said things got worse with the defendant from October into November, and she called the police three or four times in November. Five days before the events giving rise to the defendant's charges, he told the victim, "you are not going to like how this ends." When asked if he was threatening her, he said he was "telling" her and that she was "responsible for everything that has happened." She heard footsteps outside her trailer as well as comments from the defendant that he watched over her while she slept and urinated all over her property.

¶ 17    Around 1 a.m. on November 20, 2016, the victim heard a voice, which she recognized as the defendant's, say her name, and she felt her trailer shake. The victim called the police, and they arrived shortly thereafter. At that time, the defendant called the victim twice and left a voicemail, which was played for the jury.

¶ 18    Then, at 4 p.m., the defendant arrived at the victim's home uninvited. The defendant said he wanted to talk, but the victim asked him to leave. The defendant persisted, but he eventually left when the victim said she would call the police.

¶ 19    Approximately 20 minutes later, the victim went outside and saw the defendant standing outside with a red gas can. The victim told him to leave and that he was

trespassing. The defendant put the gas can down, pulled a "black handled box cutter knife" out of his pocket, and approached the victim. The two struggled as they entered the victim's house, with the victim telling the defendant not to come in any further and the defendant trying to grab the victim's phone away from her. He told her that he was not going to hurt her and said he wanted to hurt himself. She recalled him making slashing movements at his throat during their struggle. The defendant then restrained the victim and told her that she was going to watch him bleed to death. They continued to struggle, her thumb was cut, and she was able to break free and run away. The defendant began to chase her but stopped. At that point, the victim looked up and saw the defendant dousing the south side of her trailer with liquid from a red gas can. She then observed her trailer on fire.

¶ 20 On cross-examination, the victim again testified that the defendant continued to come to her house even after she told him she wanted to have less contact with him. In August, the victim would call the defendant every day and read to him from a spiritual book. In September, the defendant told her about a spiritual place in Indiana, and she agreed to go with him. When the victim went on her vacation in September, the defendant insisted that she let him do something to help around her house while she was gone so she let him take care of the plants outside her home. The victim said she never did past regression therapy with the defendant, and they did not talk about past lives or healing ceremonies.

¶ 21 After the State rested its case, defense counsel filed a motion for directed verdict, which was denied. The defendant then testified that he met the victim in April 2016, and

8

they started a physical relationship that continued until July, when she said she needed space. The defendant stated that he was not upset, but he was confused because the victim continued to see him and have sex with him. They also took a trip to Indiana together. The defendant said he fell in love with the victim, and he never threatened her.

¶ 22    The defendant also testified that during their relationship, he told the victim about his motorcycle accident as well as the pain he suffered as a result. The defendant had limited mobility in his leg due to the injuries he sustained, and he was unable to run. The defendant stated that he did past life regression therapy with the victim to try and get rid of his emotional pain. The defendant would go to her trailer, lie on the couch, and drink tea while she played soothing music. The defendant stated they also had a ceremonial burn right before she left for her vacation, and he offered to look after her plants.

¶ 23    After the victim returned from her vacation, she told the defendant that she wanted him to stay away, and she would call the police if he drove by or called her. The defendant said he felt threatened, so he went to the courthouse and asked for an order of protection. The order was denied, and he ultimately asked for her forgiveness. The defendant saw the victim less after that, but they continued to see each other and have sex.

¶ 24    The defendant admitted that he called the victim around 1 a.m. on November 20, 2016, after leaving the Blue Bell Tavern, because he was intoxicated. The defendant denied going to the victim's residence that morning. Then, later that day, around 4 p.m., the defendant went to the victim's residence. The victim invited him in because they were going to burn his journals as a way to say goodbye. The defendant denied having a knife or gas can with him. The defendant stated that they embraced, kissed, drank tea, and

"engaged in intimacy." When the victim got up, the defendant felt warm fluids running down his neck. He felt no pain or shock but "knew something had happened." He asked the victim if she was just going to sit there and watch him die. The next thing he remembered was "waking up in an inferno" because the trailer was on fire. The defendant could not get off the floor but was eventually able to get out and "crawl" home.

¶ 25 On cross-examination, the defendant testified that he was friends with Mike Alde; he talked to Alde about his relationship with the victim numerous times and told Alde that the victim told him to stay away from her. The defendant denied slitting his own throat and encountering Chief Bland on his way back to his house.

¶ 26 The State called two witnesses in rebuttal to the defendant's testimony. Michelle Lebon, the owner of the Blue Bell Tavern, testified that she talked to the defendant about the victim the night before the incident. When asked if the defendant told her that he was not going to jail, she responded that he said, "he wouldn't last. He didn't think he could do it." The defendant did not make any threats about the victim; he said he was in love with the victim and felt abandoned by her.

¶ 27 Alde testified that he spoke with the defendant about his relationship with the victim. Around late June or early July, the defendant told Alde that the victim had asked him to stay away. Alde told the defendant that he should stay away from her. Alde believed that he had this conversation with the defendant approximately three times. After the victim returned from her trip, the defendant told Alde that he could not stay away from her. Around mid-to-late October, the defendant said the police would never take him to jail.

¶ 28   The jury found the defendant guilty on both counts.  The defendant subsequently filed a motion for a new trial, which was denied.

¶ 29   The presentence investigation (PSI) report prepared prior to sentencing contained the defendant's criminal history, health history, his statements regarding what occurred, and various other supporting documents.  Also included in the PSI was the defendant's allegation that:

> "When I asked for subpoenas for witnesses my attorney said the county was too broke to do it.  When I called him out in front of the judge he denied it.  I was judged by twelve people and it was strange I had no witnesses or a shred of evidence on my behalf.  One of their key witnesses was the woman's brother in law['s] brother who is my friend from childhood.  He takes Depakote and drinks daily and has legal issues with his spouse.  During the trial they made me move away from her and it was obvious to the jurors that they were trying to make her look scare[d] of me."

¶ 30   During the sentencing hearing, the State presented testimony from Chief Bland about his prior contact with the defendant.  In response, the defense presented the testimony of Michael Cross, who had known the defendant for 42 years and had never seen him be violent towards anyone.  Thereafter, the defendant made a statement of allocution.

¶ 31   The trial court stated that it considered the PSI, all the documents filed by both sides, "the history, character, and attitude" of the defendant, the evidence presented, arguments made, statement of allocution, and the statutory factors in aggravation and mitigation.  The court found that the first aggravating factor applied, as the defendant's "conduct both caused and threatened serious harm."  The court further found that, in terms of the third aggravating factor of criminal history, the defendant had relevant prior convictions to consider.  The court also said it would give "some weight" to the situations described by Chief Bland.

¶ 32    The trial court then sentenced the defendant to 22 years' imprisonment followed by 3 years of MSR as to count I and 15 years' imprisonment followed by 2 years of MSR as to count II, with the sentences to run concurrently.  The defendant filed a motion to reduce sentence, which was denied.  The defendant also filed a motion to modify judgment and sentence order, arguing that he should only have to serve 50% of the sentence, instead of the original 85% that was imposed.  The court agreed that the State failed to offer any evidence that the defendant's conduct led to great bodily harm and granted the motion. The court issued an amended judgment and sentence on February 23, 2018.

¶ 33    The defendant filed his notice of appeal on March 1, 2018.

¶ 34                                II. ANALYSIS

¶ 35    On appeal, the defendant argues his cause should be remanded for further proceedings in accordance with *People v. Krankel*, 102 Ill. 2d 181 (1984), because the trial court did not address his *pro se* posttrial claim of ineffective assistance of counsel.  The State concedes that the allegation raised in the defendant's PSI was sufficient to trigger a *Krankel* inquiry.  The State asserts, however, that remand is unnecessary because the court addressed the defendant's complaints about his counsel prior to trial.

¶ 36    The question of whether the trial court adequately inquired into a defendant's claim of ineffective assistance of counsel is a question of law that is reviewed *de novo*.  *People v. Jolly*, 2014 IL 117142, ¶ 28; see also *People v. Moore*, 207 Ill. 2d 68, 75 (2003).  Where defendant raises a *pro se* posttrial claim of ineffective assistance of counsel, the court should examine the factual basis of the claim, and under certain circumstances, must appoint new counsel to argue the claim.  *Moore*, 207 Ill. 2d at 77-78.  However, new

12

counsel is not automatically required merely because defendant presents a *pro se* posttrial claim that his counsel was ineffective. *Id*. at 77. If the court finds that defendant's claim lacks merit or only pertains to matters of trial strategy, then the court need not appoint new counsel and may deny defendant's *pro se* motion. *Id*. at 78. If, however, defendant's allegations show possible neglect of the case, the court should appoint new counsel to argue defendant's claim of ineffective assistance. *Id*. The court's inquiry can include any of the following: (1) the court may simply ask trial counsel questions about the facts and circumstances surrounding defendant's allegations, (2) the court can engage in a brief discussion with defendant, or (3) the court can base its evaluation on its personal knowledge of defense counsel's performance at the trial and the insufficiency of defendant's allegations on their face. *Id*. at 78-79.

¶ 37    With regard to triggering this process, the Illinois Supreme Court has examined the question of how much detail a *pro se* defendant must provide to warrant a *Krankel* inquiry. *People v. Ayres*, 2017 IL 120071, ¶¶ 9-18. The *Ayres* court concluded that "when a defendant brings a clear claim asserting ineffective assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id*. ¶ 18. The *Ayres* court noted that, for a reviewing court, the operative concern is whether the trial judge conducted an inquiry that was adequate. *Id*. ¶ 13. The goal of the inquiry "is to facilitate the trial court's full consideration of a defendant's *pro se* claim and thereby potentially limit issues on appeal." *Id*. A proper inquiry will create the record necessary to adjudicate any claims raised on appeal. *Id*. Likewise, the failure to conduct a proper inquiry precludes appellate review. *Id*. The court reiterated that the purpose of the inquiry

by the trial judge "is to ascertain the underlying factual basis for the ineffective assistance claim and to afford a defendant an opportunity to explain and support his claim." *Id.* ¶ 24.

¶ 38    In the present case, it is undisputed that the defendant's *pro se* posttrial claim of ineffective assistance of counsel contained in the PSI was sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry. Therefore, the only issue on appeal is whether the trial judge conducted an adequate preliminary inquiry into the defendant's claim. We find that it did not. Although the court stated that it considered the PSI with respect to sentencing, the record contains no indication that the court even acknowledged the defendant's *pro se* posttrial claim of ineffective assistance of counsel contained therein. Under these circumstances, we conclude that the court erred by failing to conduct the necessary preliminary inquiry into the defendant's *pro se* posttrial claims of ineffective assistance of counsel.

¶ 39    We note that the State has not cited any case law to support its position that where a trial court addressed a defendant's complaints about his counsel prior to trial, it is relieved of its duty to conduct a preliminary *Krankel* inquiry when an ineffective-assistance-of-counsel claim is asserted posttrial. Similarly, our independent research has not uncovered any cases so holding. The State is correct that the court may base its evaluation of defendant's *pro se* posttrial claim on its personal knowledge of defense counsel's performance at the trial and the insufficiency of defendant's allegations on their face. See *Moore*, 207 Ill. 2d at 78-79. However, this rule pertains to how the court may conduct its preliminary *Krankel* inquiry into the underlying factual basis of defendant's *pro se* posttrial claim of ineffective assistance of counsel, which presupposes that the court did conduct

14

such an inquiry. *Id.* Based on the record before us, we cannot conclude that a preliminary *Krankel* inquiry occurred in this case. Where there is no inquiry, and there is no indication that the court gave adequate consideration to the defendant's *pro se* allegations, the only appropriate action for the reviewing court is to remand the matter so that the court can conduct a proper inquiry. See *id.* at 79.

¶ 40    We want to emphasize that we are not remanding for a full evidentiary hearing and the appointment of counsel on the defendant's claims. See *id.* at 81. Instead, we are only remanding for the limited purpose of allowing the trial court to conduct the required preliminary inquiry. See *id.* "If the court determines that the claim of ineffectiveness is spurious or pertains only to trial strategy, the court may then deny the motion and leave standing defendant's convictions and sentences. If the trial court denies the motion, defendant may still appeal his assertion of ineffective assistance of counsel along with his other assignments of error." *Id.* at 81-82.

¶ 41    Because this case must be remanded to allow the trial court to conduct proper *Krankel* proceedings, we decline to address the defendant's other allegations of error. See *Ayres*, 2017 IL 120071, ¶ 13 ("[T]he goal of any *Krankel* proceeding is to facilitate the trial court's full consideration of a defendant's *pro se* claim and thereby potentially limit issues on appeal."). Depending upon the results of the court's proceedings on remand in this case, the defendant's other claims of error may become moot. We direct appellate counsel to provide copies of their briefs to the trial attorneys and trial judge on remand. See *People v. Bell*, 2018 IL App (4th) 151016, ¶ 37.

¶ 42                        III. CONCLUSION

¶ 43    For the foregoing reasons, we remand the cause to the circuit court of Christian County with directions that the trial judge conduct a proper inquiry into the defendant's *pro se* posttrial claims of ineffective assistance of counsel.


¶ 44    Remanded with directions.