NOTICE
Decision filed 03/20/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230827-U

NO. 5-23-0827

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 16-CF-229 |
| | ) | |
| BRIAN K. FERGUSON, | ) | Honorable |
| | ) | Bradley T. Paisley, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's convictions and sentences are affirmed where the trial court did not abuse its discretion in limiting the defendant's testimony about his alleged intoxication, his trial counsel was not ineffective for failing to present legal authority on whether intoxication evidence is admissible, and the defendant was not denied a fair sentencing hearing.

¶ 2    Following a jury trial, the defendant, Brian K. Ferguson, was found guilty of home invasion and residential arson. He was sentenced to 22 years in prison for the home invasion conviction and 15 years in prison for the residential arson, with the sentences to run concurrently. On appeal, the defendant contends that (1) he was denied a fair trial where the trial court erroneously barred him from testifying that he was given an incapacitating drink immediately before the arson; (2) alternatively, his trial counsel was ineffective for failing to respond to the trial court's request for legal authority on whether evidence of the defendant's intoxication was admissible; and (3) he

1

was denied a fair sentencing hearing where the trial court relied on an improper aggravating factor and uncorroborated hearsay evidence.

¶ 3                                    I. BACKGROUND

¶ 4    On November 20, 2016, the defendant was charged by information with one count of home invasion and one count of arson. The information was amended on December 19, 2016, and on May 18, 2017. The second amended information alleged that (1) the defendant committed home invasion in that he unlawfully entered Jacqueline Anderson's residence, knowing or having reason to know that she was present, and used force or threatened the imminent use of force while armed with a knife (720 ILCS 5/19-6(a)(1) (West 2014)); and (2) the defendant committed residential arson of Anderson's residence (*id.* § 20-1(b)).

¶ 5    On May 22, 2017, the defendant's three-day jury trial commenced. Prior to the testimony, the State made an oral motion *in limine* to prevent the defendant from testifying that he was involuntarily drugged on the night of the incident. In response, the defendant's counsel denied having any intention of presenting involuntary intoxication as a defense. However, defense counsel argued that the defendant could testify that he "was drugged, [he] fell asleep, [he] woke up, and [his] throat was slit and the place [was] on fire." Defense counsel argued that the defendant would not be testifying that he had committed the offense but that he was "passed out" when the offense was committed. The State indicated that it was "okay" with that proposed testimony.

¶ 6    The following testimony was then presented. Officer Jason Cole of the Pana Police Department testified that he was dispatched to Anderson's residence around 4:21 p.m. on November 20, 2016. Officer Cole stated that Anderson had told the dispatcher that the defendant had cut his own throat and lit Anderson's house on fire. Prior to arriving at Anderson's residence, Officer Cole learned via dispatch that the defendant had returned home. Thus, Officer Cole left to

2

assist another officer who was already at the defendant's residence. The defendant's residence was "directly across the lake" from Anderson's residence. After the defendant was arrested, he was taken to the hospital because he had deep cut marks on both sides of his neck. Thereafter, the defendant's home was searched. At the residence, the officers collected some of the defendant's clothing, which were suspected, at the time of collection, of being exposed to gasoline. Also, a utility knife was recovered from the front porch area of the residence.

¶ 7    Daniel Bland, the Pana Police Department's chief of police, testified that he was on his way to Anderson's house when he observed the defendant aggressively walking toward his vehicle. Chief Bland stopped his vehicle; activated his emergency lights; and as he exited the vehicle, he observed the defendant making slashing motions across the defendant's throat while pointing at Chief Bland. Chief Bland also observed what appeared to be lacerations on the defendant's neck and blood on the defendant's shirt. The defendant then quickly turned toward his residence, and Chief Bland lost sight of the defendant due to the brush and debris. Chief Bland then contacted Officer Cole for assistance in securing the residence. Chief Bland testified that the defendant's residence was a short walk from Anderson's residence. On cross-examination, Chief Bland acknowledged that the defendant's clothing was not tested for the presence of gasoline.

¶ 8    Adam Ladage, who was an officer with the Pana Police Department, testified that he collected the clothing that Anderson was wearing during the incident, and he did not recall smelling gasoline on them. A man's brown shoe, which appeared to be a match to the shoe discovered in the defendant's residence, was found on the path between Anderson's residence and the defendant's residence. This shoe was found one or two days after the execution of the search warrant at the defendant's residence. When asked on cross-examination whether the shoe found

3

outside smelled of gasoline, Officer Ladage responded, "No, not really." However, he noted that the shoe discovered in the defendant's residence still smelled of gasoline.

¶ 9      Terry Ooms of the Illinois State Fire Marshal's Division of Arson Investigation testified as an expert witness. Ooms conducted the arson investigation in this case. During his investigation, he observed that two structures were burned, Anderson's trailer and a shed on the property, as well as three vehicles in the driveway. Ooms opined that the trailer was a total loss. Oom's accelerant detection canine made multiple "positive indications for the presence of flammable or ignitable liquids" around the south side of the residence's exterior. Ooms testified that the samples that he retrieved from that location tested positive for the presence of gasoline. Ooms detected a strong odor and observed visible signs of petroleum products on the ground in the area where the canine had indicated. Based on his investigation, Ooms concluded that the fire at Anderson's residence was intentionally set. On cross-examination, Ooms acknowledged that, as an arson investigator, he would not determine the presence of gasoline by smell alone.

¶ 10     Randy Bruns testified that he had known the defendant for approximately 20 years. During the first week of October 2016, Bruns had a conversation with the defendant, in which the defendant indicated that he was not doing well. The defendant explained that he had married Anderson about one month before,[1] and then she had gone to a retreat, but after she returned, she did not want anything to do with him. Bruns also saw the defendant the morning of the incident. Bruns noted that the defendant did not seem angry, but he looked "hollowed."

¶ 11     Holly Harlow testified that she encountered the defendant at Stephen Presnell's house on November 20, 2016. During the encounter, she noticed that the defendant had blood all over his shirt and that his throat was slit. The defendant asked her and Stephen to call 9-1-1 and then he

---

[1]There was no evidence offered at trial that the defendant and Anderson were actually married.

left, walking toward his home. On cross-examination, Harlow testified that the defendant was not carrying a knife or a gas can at that time. She also did not smell gasoline on him.

¶ 12 Brian Downey testified that he encountered the defendant walking in the area after the incident. The defendant was covered in blood, so Downey asked if the defendant needed help. The defendant told Downey to "leave him the f*** alone and to get the h*** out of there" and continued nonchalantly walking down the street.

¶ 13 Mary Monroe testified that she had known the defendant since they were children. Monroe had a conversation with the defendant about two weeks before the incident, in which the defendant expressed confusion over why Anderson did not want him to come over. He indicated that he had gone to Anderson's home, but she had asked him to leave. The defendant was upset over the interaction. Monroe also had a similar conversation with the defendant a few days before the incident where the defendant indicated that he had gone to Anderson's residence, and Anderson told him to leave, or she would call the police.

¶ 14 Outside of the jury's presence, the State readdressed its motion *in limine*, which sought to bar testimony that the defendant was involuntarily drugged or intoxicated, and argued that the defendant had failed to properly plead involuntary intoxication as a defense. The State acknowledged defense counsel's argument that any evidence of the defendant's alleged involuntary intoxication would not be used to support a defense because the defendant did not admit that he had committed the criminal act. However, the State argued that if the defendant claimed to be involuntarily drugged, that would be the same as using that evidence as a defense. Defense counsel disagreed, arguing that the evidence would not be used to support an affirmative defense where the argument was that the defendant was involuntarily drugged and consequently had no memory of the incident. The trial court then questioned the relevance of that evidence.

5

Defense counsel explained that since Anderson claimed that the defendant had slit his own throat, the defendant could contradict that by testifying that he drank something, passed out, and someone else slit his throat. The trial court responded, "Well, what you're wanting to say is that he was involuntarily drugged because you're going to say he drank something that she gave him and then he passed out." The trial court noted that, with that proposed testimony, the defendant was "getting into the area of involuntarily intoxicated, which [was] a defense that's never been pled." The State interjected, noting that there was toxicology testing that refuted the defendant's assertion that he was drugged.

¶ 15　The trial court then questioned defense counsel about what the proposed testimony would be offered for if not as a defense. Defense counsel responded that it would be offered to show that the defendant had not slit his own throat because he was passed out at the time, but he did not know who did it. Defense counsel also explained that the defendant could testify that he was passed out in the house when the residence was set on fire. Defense counsel disagreed with the position that this was an affirmative defense, noting that, if it was, he would have pled it. Defense counsel then reiterated that the defendant was not admitting to committing the offenses while under the influence.

¶ 16　In response, the trial court stated, "I would love to have some authority, which I don't have any. I mean, this seems *** to me *** like a blatant attempt to get an affirmative defense in without having to plead it because I can see the argument now, he went over there, she gave him a drink, he doesn't know what the heck happened, how can he be held responsible for that?" Continuing to address defense counsel, the trial court noted that counsel had not presented any authority to support counsel's position, even though it had continued the matter to allow the parties to provide authority on the issue.

¶ 17    The following exchange then occurred between the trial court and counsel for both parties:

"[DEFENSE COUNSEL]: *** So, now if you say that I didn't do it *** and that's *** because I could not have done it because I passed out at the time and then I woke up and I did not do it, then that's not an affirmative defense. The affirmative defense is I did it, but I was drugged. He's not saying that. He's saying I didn't do it, I don't know who did it to me, but I didn't do it. That is not an affirmative defense. That is just a defense.

So, you're not offering the voluntary intoxication, that somehow robbed him of his intent because he's not saying he did it. That's the crux behind the affirmative defense. So, that's why it comes in.

Now, you can cross-examine him and do whatever you want to try to impeach him. He doesn't have to say that he was drugged, just that he passed out.

THE COURT: But I don't think that's even really an issue that the State has. I think the State's issue is saying that somebody else gave him something that made him pass out, such that it appears it was involuntary. That's where this gets sticky. *** I'm assuming the State doesn't object if he says, hey, I drank something and I passed out and I woke up and the place was on fire, I don't know what happened—

[DEFENSE COUNSEL]: That's exactly right, perfect.

THE COURT: Right?

[THE STATE]: It can't be coming from her.

[THE COURT]: But he can't say that she gave me something, I drank it, passed out, woke up and the place was on fire. What difference does it make to your defense who gave it to him unless it's jury nullification? It has no relevance.

[DEFENSE COUNSEL]: I don't know how that can be jury nullification—

7

THE COURT: Because the argument's going to be you're going to argue an affirmative defense to the Jury.

[DEFENSE COUNSEL]: I'm not arguing an affirmative defense.

THE COURT: Okay. Tell me what relevance it has with who gave him the drink?

* * *

[DEFENSE COUNSEL]: All right. That's fine. I won't even—I drank something, fine. If he wants to say I drank something and I passed out, great, perfect.

THE COURT: I don't think the State is objecting to that."

¶ 18    The State then verified that it had no objection to the defendant testifying that he did not remember what had happened because he drank something, passed out, and then woke up while the residence was on fire. Thus, the trial court found that the defendant was permitted to testify that he did not recall what had happened because he drank something and passed out, but he could not identify the person who gave him the drink or state that someone else gave him the drink. The trial court, addressing defense counsel, noted that was the ruling unless counsel had authority to the contrary. Defense counsel responded that he would "just move on."

¶ 19    The testimony then resumed. Anderson testified that she met the defendant in April 2016, and they began a physical relationship in May. In July 2016, she ended their relationship due to his behavior, and she asked the defendant for space and to just be friends. She also asked him to decrease his visits to her home because he had been going there about every day. However, the defendant's visits instead increased and, at times, she would tell him to leave. She acknowledged inviting him over to her home one time in July because she needed his help. In late September, she told him that she did not want any contact with him anymore and that she did not want him to

8

come to her home. He initially agreed and left, but he later returned and told her that he wanted it in writing. He also returned that evening and told her that "he wanted [her] gone."

¶ 20   Anderson testified that the unwanted interactions escalated in October and November. A few days after she told the defendant that she no longer wanted contact with him, he approached her outside of her home and told her that he had filed for an order of protection against her because she had said that she would call the police on him. However, he said that the order of protection was denied. She also had another unwanted interaction with him where he approached her five days before the incident and told her that she would not like "how this ends," and she was responsible for "everything that has happened." There was another incident where he was outside her residence yelling about how he would let everyone in Pana know what she had done to him. Anderson contacted the police three times in November because she had heard footsteps outside her residence, and the defendant had told her that he watched her while she slept and that he urinated all over her property.

¶ 21   At around 1 a.m. on November 20, 2016, Anderson heard the defendant's voice and felt her trailer shake. She told him to go away, and she called the police. While the police were at her residence, the defendant called her two times and left a voicemail, which was played for the jury. The defendant then returned to her house at 4 p.m. that day and said he wanted to talk. Anderson told him that she did not want to talk and asked him to leave, but he did not leave until she threatened to call the police. Approximately 20 minutes later, Anderson went outside and saw him standing outside her residence with a gas can. Anderson told him to leave and that he was trespassing. He put the gas can down, pulled a "black handled box cutter knife" out of his pocket, and approached her. Anderson grabbed her phone and started to call the police, but he attempted

9

to grab the phone from her. He told her that she was "making this domestic now," and he charged at her, knocking her down on the living room sofa. Before she could get up, he had restrained her.

¶ 22    The defendant then held the knife up to Anderson's eye and told her that she was going to watch him bleed to death. He took his right hand and made slashing movements at his throat and then Anderson felt blood on her face. As she continued to struggle, she heard the defendant say that it was not "working," as he should be feeling weak. Anderson was able to break free from him, but he caught her before she was able to get away. He grabbed her from behind, put her in the same hold restraint, and pulled her on top of him on her bed. He wanted her to look at him through a nearby mirror and see what she had "done to [him]." During the struggle, Anderson's thumb was cut with the knife, and the bedspread became saturated with blood.

¶ 23    Anderson eventually unlocked the outside door in her bedroom with her foot, opened the door, and threw her cell phone outside. At that point, the defendant became distracted, and she was able to free herself, run outside, and grab her cell phone. The defendant began chasing her, but he stopped following her. Anderson went to her neighbor's house and called the police. She saw the defendant pouring liquid from the gasoline can on the south side of her trailer and then walking around to the west side. Within minutes, her trailer was on fire. At this point in her testimony, Anderson was shown a photograph of the knife recovered from the defendant's residence. However, she noted that the knife in the picture was not the same knife that the defendant had at her house. She then explained that she never obtained an order of protection or a no contact order against the defendant because she was afraid.

¶ 24    On cross-examination, Anderson testified that even after she told the defendant that she wanted to have less contact with him, he continued to come to her house. When she reminded him that she wanted less contact, he responded that he "couldn't help it." There were also times when

10

she told him to leave her house, but he would return. The defendant's visits increased from once or twice per day before July, to three to four times per day from July until September, and then to five or six times per day after that. In August, she called him every day to read to him from a spiritual book, so he would decrease his visits to her house. He appeared to calm down when they did the readings. She disagreed that he was coming over with her consent, noting that he came over uninvited. She explained that he would not listen and would not stop coming over, so she placated him.

¶ 25    Anderson acknowledged that even though she had told the defendant that she wanted space, she allowed him to care for her plants while she was out of town in September. However, she explained that he insisted on taking care of her place while she was gone, so she told him that he could care for the outside plants. She acknowledged testifying on direct that in September, there was an incident where the defendant showed up at her house, pushed his way inside, and asked to sleep on the floor. She noted that he "lunged on the floor, plopped on the floor" after she told him that he was not allowed to sleep there. However, when she reported the incident to the police, she did not tell them that he had pushed his way into her home. Also, the next day, he told her about a spiritual place in Indiana, and she agreed to go with him because she wanted to go. In October, she visited the defendant's mother, and the defendant was there at the time. Anderson denied doing any past regression therapy and healing ceremonies involving substances with the defendant. When asked whether the defendant had ever threatened her with physical harm, she noted that he had made general comments saying that he wanted to see her gone, and he never wanted to see her again. She acknowledged that during the incident in question, the defendant told her that he wanted to hurt himself, and he was not going to hurt her.

11

¶ 26 After the State rested its case, the defendant testified. The defendant testified he met Anderson in April 2016, and they started a physical relationship that continued until July. In July, Anderson told him that she needed space and time for herself. He was not upset about Anderson's request, and he intended on honoring the request. However, he was confused because after her request for space, she continued seeing him, visiting him at his house, and having sex with him. They also took a trip together to Indiana, which was initially her idea. They had a burning ceremony right before she left for vacation, and he offered to clean up the ash from the fire and to take care of her plants while she was away. She offered him a key to her residence, but he declined.

¶ 27 However, the defendant indicated that, after Anderson returned from her trip, he was "floored" by her reaction to seeing him. She immediately told him that she wanted him to stay away, and she would call the police if he drove by her residence or called her. However, after that, she drove by his residence while he was standing outside, and she honked and waved at him. He felt threatened by Anderson's behavior and felt like there was "trouble coming," so he sought an order of protection against her. When the defendant told Anderson that he had attempted to obtain an order of protection against her, she was hurt, and he ultimately asked for her forgiveness. He saw her less after that, but they continued to see each other and have sex. He also continued to do work around her property, and she visited his residence in November. He did past life regression therapy with her, during which they drank tea while she played soothing music.

¶ 28 The defendant called Anderson around 1 a.m. on November 20, 2016, when he was intoxicated. He explained that he was confused because she had threatened to call the police on him, but she had continued to see him. He also went to her residence around 4 p.m. to pick up his journals because they were going to burn the journals as a way of saying goodbye. He denied forcing himself into her residence, claiming that she had invited him inside. He also denied having

12

a knife or a gas can with him. While he was inside the residence, they embraced, kissed, drank tea, and "engaged in intimacy." When she got up, he felt warm fluids running down his neck. He felt no pain or shock but "knew something had happened." He then asked her if she was going to "sit there with [him] and watch [him] bleed to death." The next thing he remembered was "waking up in an inferno" because the trailer was on fire. He was initially unable to lift his shoulders off the floor but, after struggling, was eventually able to roll out the door.

¶ 29 Once outside, the defendant started looking for Anderson. He walked around the northwest corner of the residence and saw her standing in her neighbor's driveway. He then essentially crawled home. He went to Presnell's residence because it was on his way home. He entered Presnell's house, grabbed a razor knife on the counter, and then left. He grabbed the knife because he "was going to finish the job." He continued to his residence, and the police later arrived. At that moment, he wanted to end his life because he hated himself for what he had "let happen again." He denied seeing Officer Bland on the way home. At some point on his way home, he lost a shoe.

¶ 30 The defendant also testified that during their relationship, he told Anderson that he had a motorcycle accident, and he suffered chronic pain from the accident. He had limited mobility in his leg due to the injuries, and he was unable to run. He denied running after Anderson, denied wrapping his legs around her, and denied setting her residence on fire. He noted that he loved Anderson and had never threatened her.

¶ 31 On cross-examination, the defendant acknowledged that he was friends with Mike Alde, and he had talked with Alde about his relationship with Anderson numerous times. He told Alde that Anderson had told him to stay away from her. The defendant denied visiting Anderson's residence before he called her at 1:19 a.m. on November 20 and also denied cutting his throat. He

13

acknowledged that his clothing was not burnt in the fire, even though he indicated that when he woke up, the flames were at his back.

¶ 32    The State then called two witnesses in rebuttal. Michelle Lebon, the owner of Blue Bell Tavern, testified that she had known the defendant for more than 30 years. The night before the incident, Lebon talked with the defendant about Anderson, and the defendant indicated that he felt abandoned by Anderson. When asked whether the defendant said that he was not going to jail, Lebon responded that the defendant said that, "He wouldn't last. He didn't think he could do it." On cross-examination, Lebon indicated that the defendant did not make any threats toward Anderson, and he essentially said that he was in love with Anderson and felt abandoned by her.

¶ 33    Mike Alde testified that he had known the defendant for 30 years, and they had talked about the defendant's relationship with Anderson. Around late June or early July, the defendant told Alde that Anderson had asked the defendant to stay away from her because he was aggravating her. Alde told the defendant to stay away, but the defendant said that he could not. Alde believed that he and the defendant had a conversation about staying away from Anderson on approximately three occasions. Around mid-to-late October, the defendant told Alde that the police would never take him to jail.

¶ 34    Following closing arguments and deliberations, the jury found the defendant guilty of home invasion and residential arson. On June 16, 2017, the defendant filed a motion for new trial and judgment notwithstanding the verdict, in which he argued, in pertinent part, that the trial court erred in granting the State's motion *in limine* with regard to his testimony that he was drugged. He argued that this testimony was not offered as an affirmative defense of involuntary intoxication, as it was not directed toward his inability to form the intent to commit a crime or otherwise deprive

14

him of the *mens rea* necessary for the commission of an offense. Instead, the testimony would show that Anderson may have drugged him to inflict harm on him.

¶ 35    Before the July 25, 2017, sentencing hearing, the trial court denied the defendant's motion. The trial court then proceeded to the sentencing hearing. The State presented testimony from Chief Bland, who testified about his prior contact with the defendant. Specifically, Chief Bland noted that the defendant had been previously arrested for the defendant's involvement in a domestic dispute where it was alleged that he was armed with a handgun. At this point in the testimony, the defendant's counsel objected to the testimony, arguing that the State was attempting to relitigate issues that had already been litigated and were dismissed as a result of the defendant entering into a guilty plea. The trial court noted that the case law was clear that it could consider evidence that was relevant and reliable, which included uncharged conduct. However, the trial court noted that the weight to be given to that evidence was "another matter." Chief Bland then continued his testimony, noting that the prior incident involved a standoff with the defendant where the defendant held a gun to his own chin, threatened to kill himself, and attempted to steal Chief Bland's squad car. The defendant also fired multiple rounds of gunshots at another individual's vehicle. He was ultimately convicted of aggravated unlawful use of a weapon and sentenced to three years in prison.

¶ 36    Chief Bland testified that on November 16, 2016, four days before the incident in question, a dispatcher reported to him that she had encountered the defendant in public, and the defendant said to her that, "I haven't forgotten, it is still coming." In addition, during the investigation of the current incident, one of the witnesses refused to say anything because the witness feared retaliation. Chief Bland also testified about asking another witness whether the witness had known about any hit list or revenge list, and the witness indicated that the defendant had spoken about a former

15

judge and another individual. Chief Bland noted that over the years, multiple officers had reported comments made by the defendant about how the defendant felt wronged by the court process, and how his time would come once his parents passed. Chief Bland indicated that the defendant had made various comments over a 10-to-12-year period about how the defendant would have nothing to live for when both of his parents passed away and that he would take care of those who had wronged him, starting with the police. Chief Bland explained that he tried to verify whether the information about the defendant was true because, in the last 10 years, his office had very little contact with the defendant, and he had never personally felt threatened by the defendant. Chief Bland testified about an occasion where the defendant said that the defendant did not have any issues with Chief Bland but that he had felt wronged and the day was coming when he would take care of business.

¶ 37    On cross-examination, Chief Bland admitted that the standoff with the defendant resulted from an incident where the defendant was shot at, but the person who shot at the defendant did not go to prison. Chief Bland acknowledged that the defendant had not threatened anyone and had not been violent toward him. In addition, Chief Bland noted that the defendant's son was murdered, and the shooter was convicted of second degree murder instead of first degree murder. There were also other individuals involved in the shooting, and they were not convicted of any offense. Chief Bland had never seen an alleged hit list.

¶ 38    In mitigation, Michael Cross testified that he had known the defendant for 42 years, and during that time, he had never seen the defendant be violent toward anyone. Cross had observed the defendant assisting others on multiple occasions. Within the past six months, Cross observed that the defendant was mentally broken, brokenhearted, and depressed. The defendant also offered a statement in allocution, in which he apologized to the trial court, to Anderson, and to his family

16

and friends. He stated that he had never harmed anyone, and he was not a threat to anyone. He asked the trial court for leniency, noting that putting him in prison for the rest of his life would not help anything. During arguments, the State requested the maximum sentences for both home invasion and residential arson, while the defendant's counsel requested the minimum sentence of six years.

¶ 39    After hearing the testimony and counsels' arguments, the trial court sentenced the defendant to 22 years in prison for the home invasion conviction and 15 years in prison for the residential arson conviction, with the sentences to run concurrently. In making this decision, the trial court considered the trial evidence; the presentence investigation report; the letters filed in support of the defendant; the victim impact statements; the defendant's history, character, and attitude; counsels' arguments, the defendant's statement in allocution; and the statutory factors in aggravation and mitigation. The trial court considered, as an aggravating factor, that the defendant's conduct caused and threatened serious harm. The trial court noted that Anderson's physical injuries were minor in nature but could have been a lot worse. However, the trial court indicated that Anderson had sustained emotional and psychological injuries, noting that Anderson had expressed in her victim impact statement that, since the incident, she constantly relived the experience, and she had a consistent feeling of being unsafe. The trial court noted that Anderson, and her sister, had also sustained other injuries, specifically in terms of personal property. The trial court then stated:

> "Everything that [Anderson] owned or possessed in the world was destroyed by [the defendant]. Everything. Every family picture. The vehicle. The house. The possessions. All of it gone. And yes, fortunately, there is insurance; and a lot of those things can be replaced. A lot of those things can never be replaced. There are a lot of things that

17

[Anderson] indicated in the Victim Impact Statement that were heirlooms, family pictures, things that may not have much dollar value to the rest of us, but to [Anderson], were priceless and can never be replaced. So, when I look at this factor, the first factor, it is a factor that weighs strongly in favor of a harsher sentence."

¶ 40     The trial court also considered, as an aggravating factor, that the defendant had a history of prior delinquency or criminal activity. However, the trial court noted that this factor "kind of cuts both ways." In aggravation, the trial court noted that the defendant had prior charges, many of which did not result in a conviction. The trial court noted that it would not "base [its] sentencing decision on things that [the defendant] wasn't convicted of." However, the trial court noted it could consider those incidents as they pertained to the defendant's character and nature. The trial court noted that there had been many charges filed against the defendant over the years that had been dismissed. The trial court noted that the defendant had a history of being accused of violating orders of protection, he had a conviction involving a weapon, and his criminal history indicated that there was a propensity for violence in some situations. The trial court also noted that the situations described by Chief Bland were relevant to the consideration. The trial court noted:

"They're not as relevant as to a situation where he would have been convicted of those things, but there is some weight that the Court will put on that testimony. Not a lot. *** [T]here is a lot of innuendo about whether [the defendant] had hit lists and all that kind of stuff. I don't know. I don't want to use that as a big aggravating factor when it is based upon *** third level of hearsay. It is relevant. It is something I can consider, but it is not something I put a huge amount of weight on."

¶ 41     The trial court believed that the defendant was an individual who followed the law when it suited him. However, if the law did not work for him, he would take matters into his own hands.

18

Thus, the trial court noted that the defendant's prior criminal history weighed in favor of a harsher sentence. Also, the trial court found that a sentence was necessary to deter others from committing similar crimes. The trial court also found that Anderson's age was a factor in aggravation, as she was 61 years old at the time of the incident.

¶ 42      In mitigation, the trial court noted that the defendant had lived approximately 10 years as a law-abiding citizen. The trial court also considered whether a sentence of imprisonment would endanger the defendant's medical condition, as he had significant medical issues. The trial court also considered the defendant's prior history in Pana; the things that had happened to him over the years, such as the murder of his son; and the reasons why he felt wronged. The trial court noted that the defendant felt like the system had failed him and expressed understanding of the defendant's feelings of frustration. The trial court also expressed sympathy for the defendant, noting that the murder of a child would have made any reasonable person frustrated, distraught, and depressed. The trial court noted that the defendant was a loving son, father, brother, and friend. However, the trial court noted that the defendant had a darker side where, when things did not go his way, he took matters into his own hands and refused to take responsibility for his actions. The trial court noted that although the defendant apologized in his statement in allocution, he took no responsibility in his prior statement and instead accused Anderson of attempted murder and sexual assault.

¶ 43      Thereafter, the defendant appealed, and this court remanded the matter to the trial court for further proceedings because the trial court did not, in response to the defendant's *pro se* posttrial claim of ineffective assistance of counsel, conduct a preliminary inquiry into such allegation pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny. *People v. Ferguson*, 2021 IL App (5th) 180144-U. At the January 27, 2022, preliminary *Krankel* hearing, the defendant

19

raised several allegations of ineffective assistance of counsel, including an argument that trial counsel was ineffective for failing to pursue the affirmative defense of involuntary intoxication. The defendant claimed that, at the time of the incident, Anderson had given him a calming tea laced with ayahuasca, a hallucinogenic. The defendant acknowledged that his toxicology screen was negative for any substances, but he claimed that the result was inaccurate. Finding that there was a question of fact as to whether trial counsel's performance was deficient, the trial court allowed the defendant's counsel to file a motion for new trial setting forth the defendant's ineffective assistance claims and advanced the matter to a second-stage *Krankel* hearing.

¶ 44 On February 9, 2023, the defendant's appointed counsel filed a motion for new trial, asserting, in pertinent part, that during the defendant's January 2017 evaluation to determine his fitness, the defendant set forth his version of what occurred on November 20. Specifically, the defendant stated that Anderson invited him to her house for a " 'final regression' "; she offered him a cup of tea, which he believed was laced with ayahuasca; and they had sex. Anderson then cut him on the right side of his neck, and the next thing that he remembered was " 'waking up in an inferno.' " The motion asserted that the defendant raised this issue in open court in May 2017, but his trial counsel did not file an affirmative defense at that time. The motion also asserted that defense counsel should have been aware that the defendant believed that he was given ayahuasca because it was mentioned in the psychiatrist's report issued before the trial. The motion argued that an involuntary intoxication defense would have opened the door for the defendant to explain the missing facts in his version of events. However, instead of introducing the affirmative defense, trial counsel had relied on a defense that the defendant had passed out without explaining why the defendant had passed out.

20

¶ 45　At the February 13, 2023, second-stage *Krankel* hearing, the defendant testified that he had discussed with his counsel raising involuntary intoxication as an affirmative defense, and counsel had said that they would argue the defense if necessary. He noted that in January 2017, he received a fitness evaluation and told the psychiatrist his version of events. He explained that on November 20, Anderson invited him inside her residence for a cup of tea, he drank the tea, they were intimate, and then he could not move. He believed that Anderson put something in the tea. However, he did not believe that it was ayahuasca because the effects were different from the times that he had previously drank tea laced with ayahuasca. With his consent and knowledge, Anderson had given him a drink laced with ayahuasca on three occasions before the incident. He complained that his trial counsel had no experts testify on his behalf about the effects of the drug given to him that night. On cross-examination, the defendant acknowledged that trial counsel could not substantiate that the defendant was given ayahuasca tea or other drugs that night.

¶ 46　At the continuation of the second-stage *Krankel* hearing, held on June 15, 2023, the defendant's trial counsel testified that asserting the affirmative defense of involuntary intoxication would have been inconsistent with the defendant's trial testimony that he did not commit the offenses. Trial counsel also noted that there was no indication that there was something in the defendant's bloodstream. On cross-examination, trial counsel indicated that he did not believe that he had researched the issue of whether the defendant had a valid affirmative defense. Also, trial counsel did not believe that he had provided the trial court with case law to support his position that the defendant was not asserting an affirmative defense. Counsel acknowledged that the defendant's belief that he was involuntarily intoxicated might have provided context to the defendant's testimony. However, counsel reiterated that it was not an affirmative defense. He

21

could not recall whether the toxicology screen tested for ayahuasca, and he did not consult with an expert witness before trial.

¶ 47     On July 31, 2023, the defendant's appointed counsel filed a memorandum in support of the motion for new trial, reiterating the arguments made in the motion but also asserting that trial counsel failed to tender authority in support of the position that counsel was not required to assert involuntary intoxication as an affirmative defense because the defendant's version of events did not raise or require an affirmative defense. Also, the memorandum noted that it was unknown whether the defendant's toxicology screen tested for ayahuasca, or similar substances, or whether the screen could even test for such substances at that time. On August 1, 2023, the State filed a memorandum in support of its request to deny the defendant's motion, arguing, in pertinent part, that had defense counsel pled involuntary intoxication as an affirmative defense, it would have been inconsistent with the defendant's trial testimony.

¶ 48     Thereafter, on October 2, 2023, the trial court denied the defendant's motion for a new trial. In denying the motion, the trial court noted that it had resolved all credibility determinations in favor of the State and against the defendant. The defendant appeals.

¶ 49                                        II. ANALYSIS

¶ 50                          1. *Involuntary Intoxication Evidence*

¶ 51     The defendant first challenges the trial court's decision granting the State's motion *in limine* barring him from testifying that Anderson gave him an incapacitating drink immediately before the arson. He contends that the trial court barred this proposed testimony based on a mistaken belief that it constituted an affirmative defense, but this evidence would have instead been offered to establish that he did not commit the offenses. Thus, he contends that he was denied a fair trial when evidence relevant to his theory of defense was excluded by the trial court.

¶ 52    As a threshold matter, the parties dispute the appropriate standard of review. While the defendant acknowledges that, typically, a trial court's decision to bar certain evidence is subject to an abuse of discretion standard, he contends that we should apply a *de novo* standard. In his appellate brief, the defendant contends that the correct standard of review is *de novo* because the question of whether a defendant's constitutional rights were violated presents a purely legal question. Subsequently, in his reply brief, he claims that the correct standard of review is *de novo* because the trial court did not actually weigh the relevance of the proposed evidence, as its decision was based on a mistaken belief that his testimony constituted an affirmative defense.

¶ 53    First, we note that it is well settled that "trial courts possess discretion in determining the admissibility of evidence, and a reviewing court may overturn a trial court's decision only when the record clearly demonstrates the court abused its discretion." *People v. Harris*, 231 Ill. 2d 582, 588 (2008). In addition, when a party claims, like the defendant does here, that he was denied his constitutional right to present a complete defense due to the trial court's improper evidentiary rulings, the standard of review is abuse of discretion. *People v. Williams*, 2020 IL App (1st) 162512, ¶ 73. The abuse of discretion standard also applies to motions *in limine*. *Id.* An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Slack*, 2014 IL App (5th) 120216, ¶ 22.

¶ 54    Second, as for the defendant's argument that the trial court did not determine the relevance of the proposed testimony when granting the State's motion *in limine*, we note that the record contradicts that argument. The record reveals that the trial court questioned defense counsel on the relevance of the specific testimony about the defendant's alleged intoxication. Consequently, the trial court's questioning the relevance of the proposed testimony indicates that it had considered

23

its relevance when deciding it was inadmissible. However, regardless of which standard of review is applied, our conclusion would be the same.

¶ 55    "A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense." *Williams*, 2020 IL App (1st) 162512, ¶ 71. However, the trial court is vested with broad discretion in ruling on the admissibility of evidence sought to be excluded as irrelevant. *People v. Hayes*, 353 Ill. App. 3d 578, 583 (2004). In assessing whether the evidence is relevant, the court must determine whether the proffered testimony would have made the question of the defendant's guilt of the charged offenses more or less probable. *Id.* A trial court may exclude evidence upon which a proposed defense is based if, in its discretion, the court determines that the probative value of the evidence is outweighed by other factors, such as unfair prejudice, confusion of the issues, or a potential to mislead the jury. *People v. Comier*, 2020 IL App (1st) 170500, ¶ 51. Also, a trial court may bar evidence on the grounds of relevancy if the evidence is remote, uncertain, or speculative. *Slack*, 2014 IL App (5th) 120216, ¶ 23.

¶ 56    An affirmative defense has the legal effect of admitting that the criminal acts occurred but denying legal responsibility for those acts. *People v. Freneey*, 2016 IL App (1st) 140328, ¶ 32. A defendant arguing that the State cannot prove him guilty of all elements of the offense beyond a reasonable doubt is not the same thing as asserting an affirmative defense. *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 119. Thus, the defendant's testimony that he did not commit the alleged offenses because he was incapacitated at the time was not offered to assert an affirmative defense. Instead, the testimony was offered to dispute the State's version of events, *i.e.*, that the defendant cut his own throat and set Anderson's residence on fire.

¶ 57    However, regardless of the reason why the evidence was offered, the trial court did not err, or abuse its discretion, in refusing to allow the defendant to testify that Anderson gave him a drink

24

that incapacitated him. The defendant contends that the proposed testimony was relevant to negate Anderson's testimony that he committed the alleged offenses and to show that he was the victim in the situation. The defendant also argues that he was unable to articulate a theory of the case without this testimony, as he was unable to explain why he was incapacitated. Thus, the defendant contends that without this proposed testimony, there was a substantial gap in his explanation of events which rendered his version unbelievable.

¶ 58    When determining whether a defendant's right to present a complete defense is violated, the courts should consider whether crucial parts of the defendant's case were excluded, so as to deny the defendant a sufficient opportunity to respond to the State's accusations. *People v. Manion*, 67 Ill. 2d 564, 577 (1977). The defendant here testified that Anderson invited him into her home, and when inside, he drank tea, and they engaged in intimacy. The defendant then noted that, after they engaged in intimacy, he felt warm fluids running down his neck. Although he felt no pain, he "knew something had happened." At that time, he asked Anderson if she was going to watch him "bleed to death." He then testified that the next thing he remembered was waking up in an inferno, as the residence was on fire. He further testified that he was unable to lift his shoulders from the floor and had to roll out of the door to escape. Thus, based on the above, the defendant was allowed to testify to the substance of his defense, *i.e.*, he did not slit his own throat, he had passed out at some point after drinking tea with Anderson, and he later woke up and observed that Anderson's residence was on fire. The trial court preventing him from identifying Anderson as the person who allegedly gave him a beverage containing an unknown substance and claiming that drinking the beverage was the reason why he was incapacitated did not prevent him from asserting a complete defense to the State's charges.

25

¶ 59    Further, we note that the prohibited testimony was based on speculation. There was no proffer of evidence to support the defendant's claim that the tea contained an unknown incapacitating substance. In fact, the defendant admitted, at his second-stage *Krankel* hearing, that his trial counsel could not substantiate that he was given ayahuasca tea or other drugs the night of the incident. Also, the defendant's toxicology screen did not reveal any substances in his system. Moreover, testimony that Anderson had given him an incapacitating drink while he was inside her residence would not be relevant to the home invasion charge, as he was already in the residence at the time that he was allegedly given the tea. Accordingly, we find that the trial court did not err, or abuse its discretion, in limiting the defendant's testimony to exclude his speculation that Anderson had given him an incapacitating beverage on the night of the incident.

¶ 60    Alternatively, the defendant contends that his trial counsel was ineffective for failing to cite legal authority to support the position that the defendant's proposed testimony was not being offered to assert an affirmative defense. To establish a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) he was prejudiced as a result of counsel's deficient performance. *People v. Valdez*, 2016 IL 119860, ¶ 14. If an ineffective assistance of counsel claim can be disposed of because the defendant suffered no prejudice, then we need not decide whether counsel's performance was deficient. *People v. Villanueva*, 382 Ill. App. 3d 301, 308 (2008).

¶ 61    To show prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Valdez*, 2016 IL 119860, ¶ 14. A "reasonable probability" is defined as a demonstration sufficient to undermine confidence in the outcome. *People v. Martinez*, 348 Ill. App. 3d 521, 537 (2004). Here, the defendant contends that he was prejudiced by his trial counsel's failure to present legal

26

authority to support counsel's position that evidence of the defendant's alleged intoxication was admissible. He argues that this case was a credibility contest between him and Anderson, and the evidence of his intoxication was the foundation of the defense's theory. He again contends that without this evidence, he was unable to present a complete defense.

¶ 62    As previously found, even though the defendant was not permitted to testify that Anderson drugged him on the night of the incident, he was still able to present his theory of the case. Moreover, we have already concluded that the defendant's testimony about his alleged intoxication would have been speculative, and the trial court did not abuse its discretion in deeming it inadmissible. Thus, even had trial counsel presented support for his position that evidence of intoxication could be admitted without asserting intoxication as an affirmative defense, there was no reasonable probability that the trial court's determination that the evidence was inadmissible would have been different.

¶ 63    In addition, if the proposed testimony had been admitted, it would not have changed the outcome of the proceedings where the evidence overwhelmingly supported the defendant's convictions. Anderson testified that the defendant entered her home without invitation, physically restrained her, cut his throat, and then later set fire to her residence. Anderson's version of events was corroborated by other evidence offered at trial. Specifically, the state fire marshal determined that the fire was intentionally set and originated in the same location that Anderson said she saw the defendant with a red gas can just prior to her home being set on fire. Some of the defendant's clothing, which was collected as evidence, was identified as containing an odor of gasoline, while there was no odor of gasoline detected on any of Anderson's clothing. Thus, even though Anderson and the defendant were the only witnesses to the incident, and they had differing accounts of what had occurred, Anderson's testimony was corroborated in all crucial respects.

27

¶ 64    Further, there is no reasonable probability that the introduction of speculative and uncertain testimony about the defendant's intoxication would have made a difference in this case. To believe the defendant's version of events, the jury would have to believe a 61-year-old woman invited the defendant inside her residence; gave him a beverage containing an unknown intoxicating substance; slit his throat; and then set fire to her own home, which consequently destroyed her home and all of her personal possessions. The defendant's version of events was unreasonable. "A jury may consider the probability or improbability of the defendant's account, the circumstances surrounding the crime, and the relevant testimony of other witnesses." *People v. Dillard*, 319 Ill. App. 3d 102, 106 (2001).

¶ 65    The defendant also argues that his *Krankel* counsel was ineffective for failing to assert the actual legal basis for trial counsel's deficient performance. The defendant notes that during the *Krankel* proceedings, *Krankel* counsel argued that his trial counsel was ineffective for failing to disclose involuntary intoxication as an affirmative defense, which resulted in the trial court limiting the defendant's testimony at trial. However, since trial counsel was correct in his claim that the defendant was not asserting an affirmative defense, *Krankel* counsel's allegation had no merit. The defendant contends that instead, *Krankel* counsel should have asserted that trial counsel was deficient for failing to research, and failing to cite supporting authority for, the issue of whether intoxication evidence can be admissible without asserting intoxication as an affirmative defense, especially since the trial court specifically requested such authority. However, as we have determined that the defendant's underlying claim is meritless, we conclude that he cannot establish prejudice for *Krankel* counsel's failure to present this specific argument during the *Krankel* proceedings. See *People v. Johnson*, 183 Ill. 2d 176, 187 (1998) (where the underlying claim lacks merit, the defendant suffered no prejudice due to counsel's failure to raise it).

28

¶ 66                              2. *Sentencing Issues*

¶ 67    The defendant next contends that he was denied a fair sentencing hearing where the trial court relied on improper aggravating factors and uncorroborated hearsay evidence. In challenging the fairness of his sentencing hearing, the defendant acknowledges that he has forfeited this challenge because he failed to make the necessary objections at the sentencing hearing or failed to raise this issue in a postsentencing motion. However, the defendant argues that we may review the claimed sentencing errors under the second prong of plain-error review.

¶ 68    The plain-error rule is a narrow and limited exception to the general rule of forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To obtain relief under this rule, a defendant must first show that a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545.

¶ 69    The defendant first contends that the trial court erred in relying on uncorroborated hearsay evidence at the sentencing hearing. It is well established that the ordinary rules of evidence are relaxed during sentencing hearings. *People v. Rose*, 384 Ill. App. 3d 937, 940 (2008). "At sentencing, the defendant's guilt has already been settled, and the sentencing judge is charged with the task of determining the type and extent of punishment, within certain statutory and constitutional limits." *Id.* The source and type of admissible information that a sentencing court may consider is virtually without limits. *Id.* at 941. For evidence to be admissible at the sentencing hearing, it is only required to be reliable and relevant, which is a determination that is within the trial court's discretion. *Id.*

¶ 70    Thus, the mere fact that testimony presented at the sentencing hearing contains hearsay does not make it *per se* inadmissible, nor does it deny the defendant his right to confront witnesses. *People v. Harris*, 375 Ill. App. 3d 398, 409 (2007). "A hearsay objection affects the weight rather than the admissibility of the evidence." *Id.* A sentencing court may find hearsay evidence relevant, reliable, and admissible when it is corroborated by other evidence. *Id.* If the evidence is considered "double hearsay," it should be corroborated, at least in part, by other evidence. *People v. Cunningham*, 2018 IL App (4th) 150395, ¶ 31. In addition, uncorroborated hearsay is not inherently unreliable, especially when the information was compiled during the course of an official investigation and where the evidence was never directly challenged. *Id.*

¶ 71    Here, the defendant challenges the following evidence that was presented at his sentencing hearing as uncorroborated hearsay evidence: Chief Bland's testimony that one of his dispatchers told him that the defendant had approached the dispatcher, and said, "I haven't forgotten, it is still coming"; Chief Bland's testimony that potential witnesses feared retaliation; and Chief Bland's testimony that one witness reported that the defendant had created a revenge hit list. The defendant argues that there was no corroborating evidence, besides " 'third-level hearsay,' " to support this testimony. He argues that the trial court's comments at sentencing demonstrate that the trial court put "some weight" on the testimony, rather than discounting the unreliable evidence.

¶ 72    Chief Bland's testimony was not inherently unreliable as it concerned information that he had obtained in the course of his investigation of the case. The information was relevant to the defendant's character and nature in that it was some evidence of the defendant's past misconduct, how he felt slighted by certain people in the community, and how he expressed those feelings. The testimony was consistent with the defendant's history of taking matters into his own hands and was some evidence of his propensity toward violence. This testimony was presented at the

30

sentencing hearing, where the defendant was present and was represented by counsel, so he had an opportunity to cross-examine Chief Bland about the offered testimony. Under these circumstances, the trial judge was well within his discretion in finding that the evidence was relevant. Furthermore, it is clear from the trial court's comments at sentencing that the court did not place undue weight upon the testimony. During the sentencing hearing, the trial court acknowledged that the testimony consisted of innuendo and was based on third-level hearsay. For that reason, the trial court indicated that it would only put "some weight" on the testimony and would not consider the evidence as a "big aggravating" factor. Thus, we find that the trial court did not abuse its discretion in admitting this testimony at the sentencing hearing.

¶ 73    The defendant next argues that the trial court erred in relying on improper aggravating factors when determining his sentence. A trial court has broad discretion in imposing a sentence. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The reviewing court gives the trial court great deference when reviewing a sentence because the trial court, having observed the proceedings, is generally in a better position than the reviewing court to determine the appropriate sentence. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). The trial court has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id.* Thus, a reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. *Stacey*, 193 Ill. 2d at 209.

¶ 74    In determining an appropriate sentence, the relevant factors that should be considered include the nature of the crime, the protection of the public, deterrence, punishment, and the defendant's rehabilitative potential. *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 14. "The weight to be attributed to each factor in aggravation and mitigation depends upon the particular

31

circumstances of the case." *People v. Garibay*, 366 Ill. App. 3d 1103, 1109 (2006). However, a trial court is prohibited from considering, as a factor in aggravation, a fact implicit or inherent in the offense for which the defendant is convicted. *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 13. Thus, a single factor cannot be used both as an element of the offense and as a basis for imposing a harsher sentence. *Id.*

¶ 75    A trial court may consider the seriousness, nature, and circumstances of the offense, which includes the nature and extent of each element of the offense committed by the defendant. *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). Also, the degree of harm caused to the victim may be considered as an aggravating factor, as the commission of any offense can have varying degrees of harm or threatened harm. *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986). When determining whether the trial court based the sentence on proper aggravating and mitigating factors, the reviewing court should consider the record as a whole, rather than focusing on a few words or statements by the trial court. *Morrow*, 2014 IL App (2d) 130718, ¶ 14. The defendant has the burden to affirmatively establish that the sentence was based on improper considerations. *Dowding*, 388 Ill. App. 3d at 943. While the imposition of sentence is generally a matter of judicial discretion, the question of whether the trial court relied on an improper factor is a question of law, subject to *de novo* review. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49.

¶ 76    Here, the defendant contends that the trial court improperly considered the fact that his conduct caused or threatened serious harm. Specifically, he points to the trial court's comment that Anderson's physical injuries could have been much worse, the trial court's discussion about how Anderson and Anderson's sister lost physical property in the fire, and the trial court's comment that this aggravating factor weighed strongly in favor of a harsher sentence. The defendant

contends that since the destruction of property is a main element of any arson charge, the trial court improperly considered an element inherent in the offense to impose a harsher sentence.

¶ 77     In considering the destruction of property, the trial court noted that, other than physical injuries, Anderson had suffered additional injuries as a result of the fire. The trial court noted that everything that Anderson owned or possessed was destroyed by the fire, including her family pictures and family heirlooms. The trial court noted that a lot of those items were priceless and irreplaceable. Thus, the record demonstrates that the trial court considered the nature and circumstances of the offense, rather than an element inherent in the offense. The trial court's comments revealed that it had considered the emotional harm suffered by Anderson and her sister with the loss of priceless family heirlooms. Based on these statements, and considering the particular circumstances of this case, we find that the trial court properly considered the extent and effect of the defendant's acts on Anderson. Accordingly, we conclude that the defendant has failed to establish a clear or obvious error occurred at his sentencing hearing and thus cannot establish plain error.

¶ 78                                   III. CONCLUSION

¶ 79     For the foregoing reasons, the judgment of the circuit court of Christian County is affirmed.


¶ 80     Affirmed.

33